Thomas SCHIRO, Petitioner–Appellant,

v.

Richard CLARK, Superintendent, and Indiana Attorney General, Respondents–Appellees.

No. 91–1509.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 15, 1991.

Decided May 8, 1992.

---

Richard D. Gilroy, Alex R. Voils, Jr., Indianapolis, Ind., for petitioner-appellant.

David A. Arthur, Deputy Atty. Gen., Office of Atty. Gen., Federal Litigation, Indianapolis, Ind., for respondents-appellees.

Before CUMMINGS, WOOD, Jr.,* and EASTERBROOK, Circuit Judges.

* Judge Wood, Jr., assumed senior status on January 16, 1992, which was after oral argument in this case.

CUMMINGS, Circuit Judge.

A broken iron, a shattered vodka bottle, pictures of the lifeless naked body of Laura Luebbehusen covered with blood and bruises, a warning note left for a friend—these trial exhibits relate the nightmarish facts of the case before us.

An Indiana jury convicted Thomas Schiro of the rape and murder of 28–year–old Evansville, Indiana resident, Laura Jane Luebbehusen. For this crime the trial judge sentenced Schiro to death despite the jury's recommendation that Schiro receive a sentence of life imprisonment. Schiro challenged the trial court's imposition of the death penalty in the Indiana Supreme Court, once on direct appeal and two additional times on collateral review. The Indiana Supreme Court affirmed Schiro's conviction and sentence in each case, and the Supreme Court of the United States denied Schiro's petition for writ of certiorari from each of the three Indiana Supreme Court judgments. Schiro sought post-conviction relief from the federal district court for the Northern District of Indiana pursuant to 28 U.S.C. § 2241 and 28 U.S.C. § 2254. In a decision on the merits, Chief District Court Judge Allen Sharp denied Schiro's petition for habeas corpus relief and issued a certificate of probable cause to appeal pursuant to 28 U.S.C. § 2253 and Rule 22(b), Federal Rules of Appellate Procedure. On appeal this Court's jurisdiction stems from 28 U.S.C. § 1291.

Because this case involves the death penalty, and because of the views of three Supreme Court Justices (Brennan, Marshall, and Stevens), we have exercised the meticulous care that such review requires, see *Schiro v. Indiana*, 493 U.S. 910, 913 n. 9, 110 S.Ct. 268–270 n. 9, 107 L.Ed.2d 218 (1989) (Stevens, J., respecting denial of certiorari), and have examined the record in its entirety. After thorough review, and for the reasons set forth below, we affirm the judgment of the district court.

I.

A. *Facts*

The evidence adduced at trial viewed in the light most favorable to the state's case against the defendant reveals the following facts.[1] On February 4, 1981, Thomas Schiro was serving a three-year suspended sentence for robbery, a class C felony, at the Second Chance Halfway House in Evansville, Indiana. R. 113 (pre-sentence investigation report), R. 889–891 (testimony of Kenneth Hood).[2] That facility houses criminals sent for counseling and treatment rather than incarceration. *Id.* at R. 888–889. While in the work-release program, Schiro worked across the street from Laura Luebbehusen's home. R. 1067–1069 (testimony of Robert Wheeler), R. 204–205 (testimony of Kenneth Hood).

At approximately 7:00 p.m. on February 4, Schiro went to an Alcoholics Anonymous meeting. R. 1435 (testimony of Mary Lee). Instead of staying for his 8:00 p.m. meeting, Schiro went to a liquor store and stole an alcoholic beverage. *Id.* at R. 1435, 1437. He took the liquor with him and went to see "quarter movies," which were characterized as hard core pornography. *Id.* at R. 1435, 1437–1439, R. 1743 (testimony of Dr. Frank Osanka). A woman who worked as a cashier at the quarter movie porn shop threw Schiro out when Schiro exposed himself to her. *Id.* at R. 1743. From there Schiro went directly to Ms. Luebbehusen's apartment. R. 1439 (testimony of Mary Lee). The time then was approximately 9:30 p.m. *Id.*

Schiro knocked on Ms. Luebbehusen's door and asked if he could use her phone on the pretext that his car would not start. R. 905–906 (testimony of Kenneth Hood),

---

1. This Court interprets the facts in the light most favorable to the state's case against the defendant. However, our presentation of the facts, like that of the Indiana Supreme Court, must necessarily rely upon the defendant's account of the events as related to persons who subsequently testified at trial. Ms. Leubbehu-

sen, of course, lost her voice and her ability to tell her story when she lost her life.

2. Unless otherwise specified, all record citations refer to the proceedings before the Honorable Samuel Rosen, who presided at defendant's trial.

R. 1425 (testimony of Mary Lee). After he pretended to use the phone, Schiro asked to use the bathroom. R. 1425–1426 (testimony of Mary Lee). When he came out of the bathroom Schiro was exposed and Luebbehusen became frightened. *Id.* at R. 1426. In an attempt to calm her, Schiro told Luebbehusen that he did not want to hurt her, that he was gay, and that he was just trying to win a bet that he could "get it on" with a woman. *Id.* Schiro went through the small apartment looking for drugs and money. *Id.* at R. 1746. He came back with drugs and two dildos. *Id.* Schiro told Luebbehusen to drink some liquor and take drugs as he did. *Id.* at R. 1745–1746, 1748. Schiro also told Luebbehusen to insert a dildo into his anus but he found that very painful. *Id.* at R. 1746–1747. Luebbehusen told Schiro that she was gay, that she had been raped as a child, that she had never had sex before, and that she did not want to have sex. *Id.* at R. 1745, 1747. Schiro then raped her. *Id.*[3] When Schiro left the room, Luebbehusen tried to leave but Schiro pulled her back in the house, dragged her by her hair, told her not to try to leave again and raped her a second time. *Id.* at R. 1749. When the liquor ran out, Schiro took her with him to get some more. R. 1441 (testimony of Mary Lee). When they returned to Luebbehusen's home Schiro raped her a third time and then passed out on the couch. R. 1428 (testimony of Mary Lee), R. 1738, 1751 (testimony of Dr. Frank Osanka). When Schiro woke up, Luebbehusen was dressed and headed out the door. R. 1428 (testimony of Mary Lee). Luebbehusen told Schiro that she would not turn him in and was just going to find her girlfriend. *Id.* at R. 1430. Schiro wouldn't let her leave and Schiro believed that she then fell asleep. R. 1750 (testimony of Dr. Frank Osanka). At that time Schiro decided that he had to kill her so that she couldn't report the rapes. R. 1428–1429 (testimony of Mary Lee). Schiro

hit her on the head with a vodka bottle until it shattered. *Id.* at R. 1428, 1429, 1430. Luebbehusen was fighting Schiro. *Id.* He picked up an iron and beat her with it; she was fighting him. She was still fighting him when he strangled her to death. *Id.*, R. 647–648 (testimony of Dr. Albert Venables). He then dragged her body from the bedroom to the living room where he performed vaginal and anal intercourse on the corpse and chewed on several parts of her body. R. 44 (psychiatric evaluation By Dr. Bernard Woods), R. 1429 (testimony of Mary Lee), R. 1738, 1751 (testimony of Dr. Frank Osanka).

When Schiro left Luebbehusen's house he took one of the plastic dildos with him and threw it in the trash behind a tavern in Vincennes. R. 1431 (testimony of Mary Lee). Schiro also took gloves that he had been wearing so as not to leave any fingerprints. *Id.* at R. 1432, 1433. He gave the gloves to his girlfriend Mary Lee who washed them, cut them in little pieces and threw them away.[4]

The following morning, February 5, 1981, Luebbehusen's roommate Darlene Hooper and her ex-husband Michael Hooper discovered Luebbehusen's body near the doorway. R. 439 (testimony of Michael Hooper). Luebbehusen's legs were spread apart and her slacks were pulled down around her ankles. *Id.* at R. 442. She had many bruises and cuts on her body, which included tooth marks, and a vaginal laceration. R. 653, 649, 657, 661–662 (testimony of Dr. Albert Venables). Blood covered the walls and floor, and parts of the house were in disarray. R. 442 (testimony of Michael Hooper), R. 543–547 (testimony of Dennis Buickel). Michael Hooper called the police, who recovered a shattered vodka bottle and a broken iron in addition to other evidence. R. 439 (testimony of Michael Hooper), R. 479, 480, 552–554 (testimony of Dennis Buickel).

**3.** We regret the Indiana Supreme Court's statement that according to Mary Lee, Schiro "told Leubbehusen he would make love to her." As far as we can tell, Mary Lee's testimony never used or suggested the term "made love," with its consensual connotations. Lee said that Schiro

said "he did it to [Leubbehusen]," and that he raped her. R.1426, 1427.

**4.** Lee later turned the pieces over to detectives. R.1433 (testimony of Mary Lee), R.808 (testimony of Donald Erk).

A few days later, Luebbehusen's automobile was discovered approximately one block away from the Second Chance Halfway House. R. 939–940 (testimony of Keith Shiver).[5]

## B. Procedural History

Because the judicial system has considered Schiro's case for over ten years, this section briefly addresses the major procedural history of Schiro's case. On September 12, 1981, in the Brown Circuit Court, in Nashville, Indiana, petitioner Thomas Nicholas Schiro was convicted of murder while committing or attempting to commit rape, Ind.Code § 35–42–1–1(2) (Burns 1979). On October 2, 1981, Judge Samuel R. Rosen pronounced a sentence of death despite a jury recommendation to the contrary. Because Judge Rosen imposed the death penalty, the case was automatically appealed to the Indiana Supreme Court. While the case was pending on direct review, the Indiana Supreme Court granted the state's petition to remand the case to Judge Rosen to make written findings of fact regarding aggravating and mitigating circumstances. Judge Rosen affirmed that at sentencing the state had proved the existence of one aggravating circumstance beyond a reasonable doubt—that "the defendant committed the murder by intentionally killing the victim while committing or attempting to commit * * * rape." Trial Court's Nunc Pro Tunc Pronouncement of Sentencing of February 23, 1983. Judge Rosen found no mitigating factors. *Id.* On direct appeal to the Indiana Supreme Court, Schiro raised numerous issues. He claimed that the Indiana death penalty statute violated the Indiana and United States Constitutions, the trial court erred in imposing the death penalty, the warrant for the search of his room was improperly issued, his confessions were unlawfully admitted into evidence, a letter he wrote regarding his prior criminal acts was improperly excluded from evidence, the jury was not supplied with proper verdict forms, and the pre-

sentence report contained improper information. The Indiana Supreme Court rejected each of Schiro's arguments, upheld his conviction and sentence, and remanded the case to the trial court for determination of the date of execution of the death sentence. *Schiro v. State*, 451 N.E.2d 1047 (1983) (*"Schiro I"*). At that time, Schiro sought review of his death penalty conviction in the Supreme Court of the United States but it denied his petition for writ of certiorari. *Schiro v. Indiana*, 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699.

Schiro petitioned for post-conviction relief in the Brown Circuit Court on May 11, 1984. His petition was heard by the Honorable James M. Dixon acting as a special judge. After a hearing, Judge Dixon denied the petition. The Indiana Supreme Court reviewed Schiro's post-conviction claims that the trial judge who sentenced him was biased and improperly considered evidence of Schiro's behavior at trial, and that he was denied effective assistance of counsel. Again, the Indiana Supreme Court affirmed the judgment of the trial court. *Schiro v. State*, 479 N.E.2d 556 (1985) (*"Schiro II"*), and the Supreme Court of the United States again denied Schiro's petition for writ of certiorari to vacate the death sentence. *Schiro v. Indiana*, 475 U.S. 1036, 106 S.Ct. 1247, 89 L.Ed.2d 355 (1986).

Schiro filed a petition for writ of habeas corpus in the United States District Court for the Northern District of Indiana. Chief Judge Allen Sharp remanded the case to the Indiana courts in order for Schiro to exhaust all available state remedies. He then filed a second petition for post-conviction relief in the Indiana Circuit Court, which petition was reviewed and denied by Special Judge John Baker of Bloomington, Indiana. The Indiana Supreme Court reviewed Schiro's case for the third time and again affirmed. It rejected Schiro's contentions that he was denied effective assistance of counsel at trial (on direct appeal and on his first petition for post-conviction

---

**5.** A police search of the defendant's room uncovered additional physical evidence of the

crime. R.735–747 (testimony of Donald Erk).

relief), that the trial court erred in finding that certain allegations were *res judicata* or waived, that the jury's guilty verdict for murder while committing a rape established that the defendant lacked the requisite mental state required for imposition of the death penalty, and that these alleged errors, taken together, constituted prejudice warranting reversal. *Schiro v. State,* 533 N.E.2d 1201 (1989) (*"Schiro III"*), certiorari denied, *Schiro v. Indiana,* 493 U.S. 910, 110 S.Ct. 268, 107 L.Ed.2d 218.

The case was then fully and independently reviewed on habeas corpus by Chief Judge Sharp of the Northern District of Indiana, who issued a final judgment denying habeas relief, 754 F.Supp. 646 (N.D.Ind. 1990), and also issued a certificate of probable cause to appeal. This Court has assumed jurisdiction under 28 U.S.C. § 1291.

## II.

### A. Judicial Imposition of the Death Penalty

■ Under Indiana law, a trial judge determines a defendant's sentence after the jury issues its sentencing recommendation. Indiana Code § 35–50–2–9 (Burns 1979) states that "[t]he court shall make the final determination of the sentence, after considering the jury's recommendation." The Indiana Code further states that "[t]he court is not bound by the jury's recommendation." On appeal in this Court, Schiro argues that the Indiana Death Penalty statute violates constitutional guarantees provided by the Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

The constitutional challenge raised by petitioner would indeed be a significant one if the Supreme Court had not largely resolved the matter in *Spaziano v. Florida,* 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). In *Spaziano,* the Court held that a judge may impose the death penalty despite a jury's recommendation to the con-

trary, since defendants have no constitutional right to jury sentencing in capital cases. Subsequent Supreme Court decisions have confirmed that holding. "The decision whether a particular punishment—even the death penalty—is appropriate in any given case is not one that we have ever required to be made by a jury." *Clemons v. Mississippi,* 494 U.S. 738, 745–746, 110 S.Ct. 1441, 1446–1447, 108 L.Ed.2d 725 (1990) (quoting *Cabana v. Bullock,* 474 U.S. 376, 385, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 (1986)). Schiro concedes that the constitution does not require jury sentencing in capital cases. He also concedes that under *Spaziano* a judge may impose the death penalty despite a jury's recommendation to the contrary. However, he attempts to distinguish *Spaziano* on the basis that the *"Tedder* standard" [6] was employed in *Spaziano* but not in his case. According to Schiro, the *Tedder* standard is constitutionally necessary under *Spaziano.* Thus he contends that the Indiana Supreme Court's failure to adopt and employ the *Tedder* standard in his case renders his sentence unconstitutional.

This Court is not persuaded that *Spaziano* requires or that reasoning commends such a holding. Under *Spaziano,* a reviewing court's responsibility "is not to second-guess the deference accorded to the jury's recommendation in a particular case, but to ensure that the result of the process is not arbitrary or discriminatory." *Id.,* 468 U.S. at 465, 104 S.Ct. at 3165. See also *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Review designed to invalidate arbitrary or discriminatory sentences not only provides a more direct link to values of fairness and consistency, but also provides a more judicially manageable standard than reviewing the level of judicial deference accorded to the jury. Short of mind-reading or the submission of evidence regarding a sentencing judge's thought processes, this Court knows of no way to distinguish a case in

---

**6.** Under the *"Tedder* standard," *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975), a trial judge may sentence a defendant to death despite a jury recommendation to the contrary if the evidence favoring the death penalty is "so clear and con-

vincing that no reasonable person could differ." Although the Indiana Supreme Court had not adopted the *Tedder* standard at the time of Schiro's case, that court subsequently adopted it in *Chavez v. State,* 534 N.E.2d 731 (1989).

which a trial judge gave serious consideration to the jury's sentencing recommendation before rejecting it, from a case in which the trial judge did not give serious consideration to the jury's recommendation before rejecting it. In short we cannot discern a practicable standard for reviewing the amount of deference the trial judge accorded to the jury's recommendation.

█ This Court, of course, seeks to ensure that the application of the death penalty statute is neither arbitrary nor discriminatory. *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), sets forth three criteria to determine whether a state has appropriately limited a sentencer's discretion. The statutory scheme must furnish clear and objective standards, specific and detailed guidance, and an opportunity for rational review of the process for imposing the death sentence. *Id.* at 427, 100 S.Ct. at 1764 (Stewart, J., plurality opinion); *Stringer v. Black*, ─── U.S. ───, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (explicitly applying the *Godfrey* principle to a "weighing" state). Furthermore, a sentencing scheme must narrow the class of persons eligible for the death penalty. *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Indiana's list of aggravating and mitigating factors provides fixed, objective and uniform discretionary constraints to guide death penalty sentencing decisions. Although Indiana vests sentencing authority in a judge rather than a jury, the judge's discretion is limited by the same factors which limit the jury's sentencing discretion. Before a judge can impose the death sentence she must find the existence of one of nine aggravating circumstances beyond a reasonable doubt. Ind.Code § 35–50–2–9 (Burns 1979). In addition, the trial judge must find that any aggravating factors outweigh any mitigating factors. *Id.* Not only has Indiana enumerated clear, objective and specific standards for imposing the death penalty, but it has also required the sentencing judge to make written findings with respect to those factors in order to facilitate appellate review. Ind.Code § 35–4.1–4–3 (Burns 1979). As a result of these safeguards, the Indiana death penalty stat-

ute will not lead to arbitrary or discriminatory results generally or in Schiro's case. There is no one set way for a state to set up its capital sentencing scheme. *Spaziano*, 468 U.S. at 464, 104 S.Ct. at 3164. In light of studies that jury sentencing leads to racial discrepancies in capital sentencing, *McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), a state might rationally conclude that judicial sentencing could prove to be a more desirable alternative. Regardless of its rationale, a state may constitutionally establish pure judicial sentencing in capital cases or it may permit judicial sentencing upon a non-binding, advisory recommendation from a jury, as Indiana has chosen to do.

█ Schiro does not contend that imposition of the death sentence in his case was either arbitrary or discriminatory. His crime was not only heinous but deliberate and calculated. As Judge Rosen noted in his pronouncement of sentence, this crime involved cruel and sadistic acts; yet Schiro wore gloves while committing those acts so as not to leave fingerprints. He makes no claim that he is innocent of the crimes charged, nor could he in light of the overwhelming testimony and physical evidence. In addition, extensive evidence revealed that he committed numerous other brutal and sadistic acts which cast doubt on his character and his ability to be rehabilitated.

Some may contend that "a judge should not have the awesome power to reject a jury recommendation of life." *Schiro v. Indiana*, 475 U.S. 1036, 106 S.Ct. 1247, 89 L.Ed.2d 355 (Marshall, J., dissenting from denial of certiorari). But under the Supreme Court's jurisprudence, which is binding on this Court, a state may elect to give its trial judges such power. While a judge's power may exceed constitutional boundaries if her judgments are arbitrary or discriminatory, what constitutes arbitrary or discriminatory sentencing need not be defined in relation to a standard of judicial deference to the jury. Because the Supreme Court established only that *Tedder* was a "significant safeguard," *Spaziano*, 468 U.S. at 465, 104 S.Ct. at 3165, not that it was an essential one, we reject

Schiro's assertion that the sentencing scheme applied in his case can be meaningfully distinguished from that at issue in *Spaziano*.

## B. Double Jeopardy

Schiro also contends that imposition of the death penalty in his case violates the Double Jeopardy Clause of the Fifth Amendment of the United States Constitution as applied to the states through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). That Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." The prohibition against Double Jeopardy only applies "if there has been some event, such as an acquittal, which terminates the original jeopardy." *Richardson v. United States*, 468 U.S. 317, 325, 104 S.Ct. 3081, 3086, 82 L.Ed.2d 242 (1984). Thus Schiro's argument hinges on his claim that he was acquitted of intentional murder. Specifically, Schiro claims that either the jury's conviction for murder while committing or attempting to commit a rape constituted an acquittal on the murder charge, or that the jury's sentencing recommendation acted as an acquittal. Each of these assertions will be addressed in turn.

■ At trial, the jury was offered potential verdicts of murder, murder while committing or attempting to commit rape, and murder while committing or attempting to commit deviate sexual conduct. R. 108. The jury found Schiro guilty of felony-murder, murder during the course of a rape, and left blank spaces beside the other two counts on the jury form. R. 108. The felony-murder charge does not require the prosecution to prove that Schiro killed Luebbehusen intentionally. Schiro argues that the jury's conviction for felony-murder

acted as an acquittal on the intentional murder charge and that the jury necessarily found that Schiro did not murder Luebbehusen intentionally. In order to assess the effect of the jury's findings, this Court looks to state law. *United States ex rel. Young v. Lane*, 768 F.2d 834, 841 (7th Cir.1985) ("states possess substantial latitude to decide *which* decisions in the criminal process are to be treated as 'acquittals'"), certiorari denied, *Young v. Lane*, 474 U.S. 951, 106 S.Ct. 317, 88 L.Ed.2d 300. The Indiana Supreme Court squarely rejected Schiro's argument that he was acquitted of intentional murder. *Schiro v. State*, 533 N.E.2d 1201 (Ind.1989). That Court stated that "[felony murder] is not an included offense of [murder] and where the jury, as in the instant case, finds the defendant guilty of one of the types of murder and remains silent on the other, it does not operate as an acquittal of the elements of the type of murder the jury chose not to consider." *Id.* Since the jury's verdict did not amount to an acquittal under state law, the jury did not previously determine that Schiro did not intentionally murder Luebbehusen. Therefore this double jeopardy argument must fail.[7]

■ Next, we address Schiro's contention that the jury's sentencing recommendation constituted a final judgment of acquittal. Schiro cites *Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), to support his proposition that the Indiana jury's advisory sentencing recommendation operated as an acquittal. Once again, the Supreme Court's holding in *Spaziano* invalidates Schiro's claim. According to *Spaziano*, *Bullington* does not apply to cases in which a judge imposes the death penalty against the jury's advisory recommendation. *Spaziano*, 468 U.S. at 453, 104 S.Ct. at 3158.

---

**7.** The collateral estoppel argument raised, not by Schiro, but by Justice Stevens' opinion respecting denial of certiorari in this case, does not change our understanding. 493 U.S. 910, 110 S.Ct. 268, 270, 107 L.Ed.2d 218. *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), bars relitigation where an issue of ultimate fact has been previously determined by a valid and final judgment. However, the de-

fendant must show that the jury's verdict actually and necessarily determined the issue he seeks to foreclose. *United States v. Patterson*, 827 F.2d 184 (7th Cir.1987) (per curiam). Here Schiro's conviction for murder/rape did not act as an acquittal with respect to the pure murder charge as a matter of state law. Thus the jury's verdict did not determine the issue of intentionality.

Unlike the binding sentencing recommendations issued by Missouri juries at the time of *Bullington,* Indiana law leaves no doubt that its juries' sentencing recommendations are only recommendations. The assumption that "the jury's constitutional role in determining sentence was equivalent to its role in determining guilt or innocence" is no longer tenable in light of *Spaziano. Cabana v. Bullock,* 474 U.S. 376, 388 n. 4, 106 S.Ct. 689, 697, n. 4, overruled on different grounds, *Pope v. Illinois,* 481 U.S. 497, 504 n. 7, 107 S.Ct. 1918, n. 7, 95 L.Ed.2d 439 (1987). Schiro had no legitimate expectation that the jury's recommendation would be his final sentence. Cf. *United States v. Di Francesco,* 449 U.S. 117, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980) (holding that modification of a sentence is not violative of the Double Jeopardy Clause when a defendant has no legitimate expectation of finality in the original sentence). No final conviction could be entered until the sentence was entered. And under Indiana law, no sentence could be entered, except by the trial judge—the only person given authority to determine the defendant's sentence. Because the jury's sentencing recommendation was not a final judgment, it could not act as an acquittal. Judge Rosen declared that the state had proved the existence of an aggravating factor beyond a reasonable doubt[8] and the jury never acquitted Schiro on the element of intentionality. Thus we reject Schiro's double jeopardy claim.

### C. Ineffective Assistance of Counsel

■ Schiro also contends that he was denied effective assistance of counsel. He bases his contention on four alleged failures of trial counsel, namely, (1) counsel failed to present evidence of mitigating circumstances, (2) counsel failed to adequately prepare or investigate the case, (3) counsel failed to submit guilty but mentally ill verdict forms to the jury and (4) counsel failed to request that the jury be sequestered or adequately admonished. In order to prove that he received ineffective assistance of counsel, Schiro must show both that counsel's performance fell below an objective standard of reasonableness and that but for counsel's unreasonable conduct, the result of the proceeding would have been different. *Strickland v. Washington,* 466 U.S. 668, 700, 104 S.Ct. 2052, 2071, 80 L.Ed.2d 674 (1984), rehearing denied, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864; *United States v. Lane,* 819 F.2d 798, 802 (7th Cir.1987). Although this standard applies to counsel's conduct as a whole, for clarity this Court will examine Schiro's first and primary contention separately.

### D. Mitigating Circumstances

Schiro alleges that the trial judge's finding of no mitigating circumstances was due to his trial counsel's failure to present any evidence of mitigating circumstances to the court. As an initial matter, this Court notes that this assertion is patently incorrect. His counsel did attempt to prove the existence of a mitigating factor, he strenuously argued that Schiro's "capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication"—one of the seven mitigating factors provided by Indiana's death penalty statute. Indiana Code § 35–50–2–9.

■ Judge Rosen's denial of the existence of any mitigating factors was not because Schiro's counsel did not raise any argument for mitigation, but because the judge found that such arguments did not justify mitigation. At trial, Schiro argued that he was a sexual sadist and that his extensive viewing of rape pornography and snuff films rendered him unable to distinguish right from wrong. In support of this assertion, his expert witness, Edward Don-

---

**8.** The Indiana Supreme Court held that "[t]he [trial] court, as prescribed by the death penalty statute, found the existence of an aggravating circumstance proved beyond a reasonable doubt." *Schiro v. State,* 479 N.E.2d 556. Whether the trial court appropriately determined the existence of an aggravating factor under Indiana law is a question of state law which Schiro has not asked this Court to review and which is not within the ambit of habeas review.

nerstein, testified that after a short exposure to aggressive pornography "non-rapist populations * * * begin to endorse myths about rape." R. 1549 (testimony of Edward Donnerstein). "They begin to say that women enjoy being raped and they begin to say that using force in sexual encounters is okay. Sixty percent of the subjects will also indicate that if not caught they would commit the rape themselves." *Id.* In addition to Mr. Donnerstein's testimony that pornography generally encourages men to commit acts of violence against women, one of defendant's other expert witnesses testified that Schiro's viewing of pornography actually encouraged him to commit the acts of violence at issue in this case. Dr. Frank Osanka testified that Schiro viewed pornographic films from age six, and throughout his childhood and his adulthood, that led him to be aroused by women's pain and taught him techniques of rape. R. 1713, 1727 (testimony of Dr. Frank Osanka, listing at least two specific films which encouraged Schiro's criminal activity). A written autobiographical statement of petitioner's which was read to the jury is perhaps most telling: "I can remember when I get horny from looking at girly books and watching girly shows that I would want to go rape somebody. Every time I would jack off before I come I would be thinking of rape and the women I had raped and remembering how exciting it was. The pain on their faces. The thrill, the excitement." R. 1368–1369 (Schiro's autobiographical statement). At closing argument Schiro's counsel relied on Dr. Osanka and Mr. Donnerstein to support his claim that "the pattern is clear, premature exposure to pornography and continual use with more violent forms created one thing, created a person who no longer distinguishes between violence and rape, or violence and sex."

Schiro contended either that pornography is a mitigating factor akin to intoxication or mental disease or defect which rendered him unable to appreciate the criminality of his conduct, or that pornography caused him to suffer from sexual sadism, which in turn rendered him unable to appreciate the wrongfulness of his conduct. After hearing such evidence, Judge Rosen rejected the arguments on the basis that defendant was sadistic, not psychotic or insane, and on the basis that he was able to appreciate the wrongfulness of his conduct. Clearly, Indiana may determine that sadism (or voyeurism, exhibitionism, and necrophilia as also claimed) does not amount to a mental disease or defect which warrants reduced punishment. This is particularly so because the primary manifestation of these conditions is criminal, anti-social conduct and under Indiana law "[t]he terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." R. 405, *Richardson v. State*, 170 Ind.App. 212, 351 N.E.2d 904 (1976). Moreover, the trial judge could permissibly find from the evidence both that Schiro understood the criminality of his conduct and that pornography is not a mental disease or defect which would permit a finding of insanity.

The troubling aspect of Schiro's defense is that his argument that pornography reduced his capacity to understand the criminality of his conduct, if successful, would not only excuse him from imposition of the death penalty but further excuse him for his criminal conduct altogether on the basis that he was not guilty by reason of insanity. Under Schiro's theory pornography would constitute a legal excuse to violence against women. This Court previously addressed the issue of pornography in *American Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323 (1985), affirmed, 475 U.S. 1001, 106 S.Ct. 1172, 89 L.Ed.2d 291 (1986). There we accepted the premise of anti-pornography legislation that pornographic depictions of the subordination of women perpetuate the subordination of women and violence against women.[9] However, we held that under the First Amendment pornography may not be banned because its harmful effects depend on mental intermediation. 771 F.2d at 329. It would be impossible to hold both that pornography does not directly cause violence but

9. See Catharine A. MacKinnon, *Towards a Feminist Theory of the State,* 195–214 (1989).

criminal actors do, and that criminal actors do not cause violence, pornography does. The result would be to tell Indiana that it can neither ban pornography nor hold criminally responsible persons who are encouraged to commit violent acts because of pornography! The recognition in *Hudnut* that pornography leads to violence against women does not require Indiana to establish a defense of insanity by pornography.[10] In *Hudnut* we said that pornographers may be liable for rape just as the instigator of a riot could be held liable for inciting that riot. 771 F.2d at 333. *Hudnut* does not suggest that the rioter or the rapist is not also culpable for his own conduct.

 As for the other mitigating factors, defense counsel is not required to present mitigating evidence where none exists. Cf. *Smith v. Dugger*, 840 F.2d 787, 795 (11th Cir.1988), certiorari denied, 494 U.S. 1047, 110 S.Ct. 1511, 108 L.Ed.2d 647 (1990). If Schiro alleges prejudice from his trial counsel's failure to present mitigating evidence at trial, as he does here, he must offer some piece of mitigating evidence that should have been presented to the trial court but wasn't. He offers none, and we fail to see what evidence of mitigation might have been offered.[11] Schiro did present evidence relating to his drug and alcohol use, but the trial court found that evidence insignificant since Schiro acted deliberately and had the capacity to appreciate the wrongfulness of his conduct. As for his criminal history, Schiro's record is replete with violent crimes. R. 113. His own expert believed that Schiro had committed some nineteen to twenty-four rapes. R. 1721 (testimony of Dr. Frank Osanka). Schiro's girlfriend testified regarding Schiro's numerous brutal, sadistic and life-threatening assaults on herself and her son. R. 1181, 1446, 1461, 1463, 1465, 1467,

1472. Linda Summorford testified that Schiro broke into her home, held a gun to her son's head and raped her in front of her six-year-old daughter who has cerebral palsy. R. 1830–1841. The jury's verdict settled any question as to whether the victim consented to sexual intercourse, see *O'Connor v. State*, 529 N.E.2d 331 (Ind. 1988), and she certainly did not consent to be murdered. Schiro's participation was as a principal and that participation was far from minor. Moreover, Schiro did not act under the domination of another person. Because Schiro has not shown any evidence of mitigating factors that his trial counsel should have offered but unreasonably and prejudicially failed to offer, his ineffective assistance claim on this point is devoid of merit.

 Schiro's other ineffective assistance claims are equally devoid of merit. He has not shown and the record does not reveal evidence that his trial counsel failed to prepare Schiro's case adequately. Counsel's failure to submit certain verdict forms to the jury was not prejudicial since the jury was accurately instructed on those possible verdicts. Finally, we do not presume prejudice where the defendant's counsel has failed to request that the jury be sequestered. *Bell v. Duckworth*, 861 F.2d 169, 170–171 (7th Cir.1988), certiorari denied, 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). Moreover, in contrast to Schiro's assertion, Judge Rosen repeatedly admonished the jury not to talk about the case with others. R. 579, 702–703, 934–936, 1064–1065, 1169–1170, 1288–1290, 1497–1498, 1660, 1791–1793.

Petitioner has not shown that his counsel's performance fell below an objective standard of reasonableness or that he was prejudiced by any such conduct. He has

---

**10.** Under repeated questioning by Judge Rosen as to the relevance of his testimony, Schiro's own witness conceded that even though the viewing of pornography is relevant to show whether Schiro sees rape as a violent crime, viewing pornography does not have "any relationship to competency or legal sanity." R.1560–1561 (testimony of Mr. Donnerstein). Indiana can decide, and appears to have decided in this case, that a defendant cannot excuse his

conduct by showing that in spite of his awareness of a person's non-consent to sexual relations, he believed that he had a right of sexual access or dominion over that person.

**11.** Indiana Code § 35–50–2–9(c) (Burns 1979) sets forth mitigating circumstances appropriate for consideration.

therefore failed to meet either of his burdens.

## E. Admissibility of Confessions

Schiro admitted killing Luebbehusen to Kenneth Hood, Second Chance Halfway House Executive Director. At trial, Hood testified regarding the substance of Schiro's confession. R. 888–935. On appeal petitioner complains that his confession was obtained in violation of the Fifth, Fourth and Fourteenth Amendments to the Constitution because he was not notified of his *Miranda* warnings; he therefore argues that his confessions and the ensuing confessions to his girlfriend should have been suppressed at trial.

■ The procedural safeguards of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), only apply to custodial interrogations. *Illinois v. Perkins*, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990); *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In order to determine whether Schiro's confession to Hood was made during the course of a custodial interrogation, the Indiana Supreme Court examined the surrounding circumstances. According to that court, Schiro approached his work release counselor and asked to discuss something "heavy." The work release counselor thought that Schiro's problem concerned his alcoholism and referred him to Executive Director Ken Hood, to whom Schiro had spoken earlier that day. Hood felt that Schiro wanted to talk and asked him general questions regarding the reason for his seeking their conversation.

"Although Hood said every indication was against it, he finally asked Schiro if he drove the victim's car and parked it near the facility. When Schiro nodded affirmatively, Hood told him he did not believe him because the records indicated that Schiro had been in the facility when the crime took place. Schiro said that the night watchman or manager had falsified the sign-in sheet. Still disbelieving, Hood asked some more questions about the murder. When Schiro mentioned that he worked near the victim's apartment, and Hood knew this to be true, Hood finally believed Schiro was responsible for the murder [which Schiro had confessed to Hood]. Flabbergasted, Hood telephoned a judge for assistance. Schiro's attorney was in the judge's chambers and told Schiro to avoid saying anything about the crime. Hood then escorted Schiro to the police station."

451 N.E.2d at 1047, 1060–1061.

■ On the basis of these facts, the Indiana Supreme Court held that Schiro was not subject to custodial interrogation at the time of his confession to Hood. The question of custodial interrogation is a mixed question of law and fact. This Court has recently noted that mixed questions of law and fact should be reviewed under a clearly erroneous standard. *United States v. Levy*, 955 F.2d 1098, 1103 n. 5 (7th Cir.1992); *Mars Steel Corp. v. Continental Bank*, 880 F.2d 928, 933–937 (7th Cir.1989) (en banc); *Mucha v. King*, 792 F.2d 602, 604–606 (7th Cir.1986); but see *United States v. Hocking*, 860 F.2d 769 (7th Cir.1988). We have suggested without deciding that a clearly erroneous standard of review is appropriate in habeas corpus cases as well as other types of cases. *Stewart v. Peters*, 958 F.2d 1379 (7th Cir. 1992); *Hanrahan v. Greer*, 896 F.2d 241, 244 (7th Cir.1990). That question need not be resolved here since the outcome of our decision would be the same under either *de novo* or clear error review.

■ When reviewing whether a defendant was in custody at the time of a confession, this Court examines the totality of the circumstances, especially the degree of restraint on the suspect's freedom. *United States v. Hocking*, 860 F.2d 769, 772 (7th Cir.1988) (noting that the key determination is whether at the time of interrogation the defendant was subjected to a "restraint on [his] freedom of movement of the degree associated with formal arrest"). Schiro contends that he was in custody at the time of his confession to Hood because the Second Chance Halfway House is a penal facility which confines residents unless they have express authorization to leave.

*Sureeporn Roll v. State,* 473 N.E.2d 161, 163 (Ind.App.1985).

 This Court rejects Schiro's assertion that any statement made by a defendant while he is under some type of supervision *ipso facto* constitutes custodial interrogation. *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 2397 (rejecting "the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent"). Cf. *Williams v. Chrans,* 945 F.2d 926, 950–954 (7th Cir.1991) (questioning by probation officer did not constitute custodial interrogation); *Minnesota v. Murphy,* 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (routine meeting between defendant and his parole officer not considered to be custodial interrogation).

 Schiro voluntarily approached Hood and asked to speak with him. Schiro was free to leave Hood's office at any time. The environment at the time of Schiro's confession to Hood bears slight resemblance, if any, to the type of coercive police conduct which the Fifth Amendment was designed to prevent. Cf. *Roberts v. United States,* 445 U.S. 552, 560–561, 100 S.Ct. 1358, 1364–1365, 63 L.Ed.2d 622 (1980) (no custodial interrogation where defendant initiated interview with investigators); *Miranda v. Arizona,* 384 U.S. 436, 478, 86 S.Ct. 1602, 1630 ("volunteered statements are not barred by the Fifth Amendment"). Unlike statements made during custodial interrogation without prior *Miranda* warnings, statements made during a noncustodial interrogation without such *Miranda* warnings do not enjoy any presumption of coercion. *United States v. Fazio,* 914 F.2d 950, 956 (7th Cir.1990). Because Schiro's confession to Hood was not made during custodial interrogation, *Miranda* warnings were not required and Hood's testimony regarding Schiro's confession was properly admitted into evidence at trial. As Schiro's confession was properly entered into evidence, this Court need not address Schiro's

further claim that testimony regarding his voluntary confession to his girlfriend was unconstitutional as a fruit of the confession to Hood. No impropriety is asserted with respect to his confession to a fellow prisoner.

### F. Deceptive Behavior at Trial

 According to Judge Rosen, Schiro tried to deceive the jury into believing that he was mentally ill.[12] Judge Rosen stated:

> This Court personally observed the Defendant, while the jury was present, making continual rocking motions, which did not stop throughout the trial, *except* when the jury left the courtroom. In the court's outer chambers, out of the presence of the jury, in the eight days of trial, the Court frequently observed the Defendant sitting calmly and not rocking. It is apparent to the Court that this may well have influenced and misled the jury in its recommendation.

Trial Court's Sentencing Judgment of October 2, 1981. On appeal, Schiro asserts violations of his Fifth, Sixth, Eighth and Fourteenth Amendment rights because Judge Rosen allegedly based his decision to impose the death penalty on his outer chambers observation of Schiro.

The Indiana Supreme Court found that Judge Rosen did not consider Schiro's apparently deceptive behavior at trial as an aggravating factor which justified imposition of the death penalty. *Schiro v. State,* 479 N.E.2d 556 (1985). Rather, Judge Rosen's observation sought to explain why the jury recommended a sentence which was against the manifest weight of the evidence produced at trial. The Indiana Supreme Court's factual determination is binding on this Court absent clear error, 28 U.S.C. § 2254(d), which has not been shown.

### G. Manacles and Shackles

 Schiro contends that as he exited an elevator in the courthouse and passed through a hallway there, the jury viewed

---

**12.** The trial judge was not the only one to observe that some of Schiro's mannerisms appeared to be "a caricature of someone mentally

ill" R.44 (psychiatric evaluation by Dr. Bernard Woods).

him in manacles and shackles. As a result he claims to have been denied both effective assistance of counsel and due process of law. A juror's inadvertent observation of a defendant in shackles and manacles outside the courtroom is presumptively non-prejudicial unless the defendant can affirmatively show that jurors were prejudiced by such an encounter. *United States v. Jones*, 696 F.2d 479 (7th Cir.1982), certiorari denied, 462 U.S. 1106, 103 S.Ct. 2453, 77 L.Ed.2d 1333 (1983). The state has a legitimate interest in seeing that the defendant once outside the courtroom remains in custody and does not flee. *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).

■ The Indiana Supreme Court has distinguished between cases in which jurors see a prisoner in shackles while being transported to and from court, *Sweet v. State*, 498 N.E.2d 924, 929 (Ind.1986), and cases in which jurors see a shackled prisoner during court proceedings, *Walker v. State*, 274 Ind. 224, 410 N.E.2d 1190, 1193–1194 (1980). That court has held that reasonable jurors can expect a criminal defendant to be in manacles and shackles during breaks and while being transported. *Jenkins v. State*, 492 N.E.2d 666, 669 (Ind. 1986). Accordingly, the Indiana Supreme Court determined that Schiro's allegation did not demonstrate prejudice. *Schiro III*, 533 N.E.2d 1201. Where the contact between the jury and the defendant was both fleeting and inadvertent, we agree that Schiro has not met his burden of showing prejudice.

### III.

This Court has considered each of Schiro's arguments and for the foregoing reasons his constitutional claims are rejected. The judgment of the district court is affirmed.