Thomas N. SCHIRO, Appellant,

v.

STATE of Indiana, Appellee.

No. 07S00–9403–SD–273.

Supreme Court of Indiana.

Aug. 7, 1996.

Rehearing Denied Dec. 13, 1996.

Monica Foster, Rhonda Long–Sharp, Indianapolis, for Appellant.

Pamela Carter, Attorney General, Dana Childress–Jones, Deputy Attorney General, Indianapolis, for Appellee.

DeBRULER, Justice.

This is an appeal from the denial of post-conviction relief. Appellant Thomas N. Schiro sought and was granted leave by this Court to file a successive petition for post-conviction relief. We granted permission to file with respect to two questions, one of which was:

> Whether Schiro is entitled to reversal of his death sentence in light of *Martinez Chavez v. State*, 534 N.E.2d 731, *modified*, 539 N.E.2d 4 (Ind.1989).

On remand, Judge Heather M. Mollo entered judgment denying post-conviction relief. Such judgment is reversed and the cause is remanded with instructions to grant postconviction relief setting aside the sentence of death and imposing in lieu thereof a term of sixty years, the maximum term provided for the offense of felony murder.

Appellant Schiro strangled Laura Luebbehusen in her house in Evansville, Indiana in 1981. He worked in her neighborhood and was an inmate of a halfway house for those facing release from prison. He gained entrance to her home by feigning the need to use her telephone. He was then under the influence of drugs and alcohol. He gained her confidence by discussing personal sexual matters, drank some more alcoholic beverages, and the two engaged in some form of sexual touching. At one point they left together to buy more alcoholic beverages. Upon their return, appellant attacked her, raped her, struck her on the head with a vodka bottle and an iron object, and finally strangled her to death. He then dragged

her into another room and sexually assaulted the corpse. Schiro drove Luebbehusen's car to the vicinity of the halfway house and there persuaded the night watchman to falsify the sign-in sheet to show that he had not been absent from the half-way house during the time of the killing. Although undoubtedly acting with an awareness that he could not avoid becoming a prime suspect in the murder, Schiro did turn himself in to the director of the halfway house, confessing the killing.

In 1981, Schiro was charged with both the intentional murder and felony murder of Laura Luebbehusen, i.e., killing her while raping her or attempting to do so. The venue of the trial was changed from Vanderburgh County to Brown County. Later in 1981, in a trial by jury, wherein the plea by appellant was insanity, appellant Schiro was convicted on the felony murder charge. The verdict form for the intentional murder was left blank by the jury.

Pursuant to Ind.Code Ann. § 35–50–2–9(b)(1) (West Supp.1996), the prosecution sought the death penalty by alleging the B(1) aggravator, namely that appellant had intentionally killed Laura Luebbehusen during the commission of the crime of rape. Following the jury sentencing hearing, the jury, after deliberating for one hour, returned a unanimous recommendation that the death penalty not be imposed. Two weeks later, after the judge sentencing hearing, the trial judge, Judge Rosen, sentenced appellant to death.

In 1983, the felony murder conviction and the sentence of death were affirmed in Schiro's first and direct appeal. This case has been considered on three previous occasions by this Court and once by the Supreme Court of the United States. Schiro's direct appeal is *Schiro v. State*, 451 N.E.2d 1047 (Ind.1983). In that appeal, Schiro made the following claim:

> In this last sub-paragraph of Issue II, Schiro urges this Court to overturn the death penalty. The main basis for his contention is that the trial court rejected the jury's recommendation that no death penalty be imposed. Schiro believes this Court should impose a stricter standard of review in situations where the trial court

and jury disagree about the imposition of a sentence of death.

*Schiro*, 451 N.E.2d at 1058. A majority of this Court resolved this claim against Schiro, concluding:

> We will not engage in a different standard of review where jury and trial court disagree.

*Id.* A majority of this Court concluded that the sentence of death was appropriate.

■ In 1989, at a time following an affirmance of the denial of Schiro's second petition for post-conviction relief, this Court decided *Martinez Chavez v. State*, requiring an express judicial response to a jury recommendation against death. *Martinez Chavez v. State*, 534 N.E.2d 731 (Ind.1989), *modified*, 539 N.E.2d 4 (Ind.1989). That approach was retained as an appellate requirement only in *Roark v. State*, 644 N.E.2d 565 (Ind.1994). There we said:

> During appellate review of a death sentence where the jury has recommended against death, two separate and distinct issues are always presented for our consideration: (i) whether the trial court sentencing statement demonstrates due consideration of the jury recommendation; and (ii) whether this Court, upon independent reconsideration of a jury recommendation against death, nevertheless concludes that the death penalty is appropriate.

*Roark*, 644 N.E.2d at 571, *citations omitted*. It was the absence of just such a form of closer appellate scrutiny for cases like his wherein the jury recommends against death, but the judge nevertheless imposes death, that Schiro specifically claimed as an impingement in his first and direct appeal. In *Chavez* and *Roark*, this Court granted that which it had specifically denied to Schiro in 1983. Therefore, we conclude that Schiro is now entitled to that which he sought: appellate review of his sentence of death by application of the *Chavez/Roark* approach.

■ From this record we know that the jury fully appreciated the details of Schiro's crime. The jurors deliberated at the guilt/innocence stage and returned a verdict of guilty of felony murder only, when intention-

al murder was also charged and before them. At the guilt/innocence stage the jury concluded only that Schiro had caused the death while intending the rape of Laura Lubbehusen, and did not reach the conclusion that Schiro had intended to cause her death. The jury at the next stage, the sentencing stage, after further instructions and further deliberations, which deliberations lasted only sixty-one minutes, unanimously recommended that the death penalty not be imposed. For the purposes of determining the appropriate value to be placed upon the jury recommendation that the death penalty not be imposed for this murder, this record strongly supports the conclusion that after the prosecution exercised two separate, full, and fair opportunities to support its claim for the death penalty based upon the existence of the intent to kill, the jury unanimously found the claim unsubstantiated.

This sentence of death imposed by the trial judge rests exclusively upon the trial judge's contrary determination that Schiro had formed the specific intent to kill, the death aggravator element. That contrary determination by the trial judge rests in no small measure upon the trial judge's inferences of evil intent and malingering on the part of Schiro from his out of the presence of the jury observations of Schiro during the course of the trial, inferences which the trial court used for override purposes without timely notice to the defense affording it an opportunity to refute such inferences. Moreover and unfortunately, that initial sentence of death was imposed by the trial judge through the use of legal standards inapplicable to capital cases, and this Court was required to remand for the application of correct legal standards. This initial faulty determination, in the very nature of this most difficult of adjudicatory processes, undoubtedly supplied inertia for the trial court's improved order on remand. Under this particular combination of circumstances leading up to the final decision of the trial court to impose death, contrary to the decision recommended by the jury, the pressure which the jury recommendation exerts against imposition of death rises to the very highest level.

In addition to the foregoing aspects of the trial, the conclusion that the jury recommendation should have maximum influence on review of the judge's decision to impose death is further supported by the evidence in mitigation. The judge and jury heard days of evidence regarding the following mitigating factors: (1) Schiro admitted his involvement in the offense and his admission expedited and assured his apprehension and conviction; (2) Schiro suffered from chronic substance and alcohol abuse and that disease manifested itself on the day of the crime; (3) Schiro was scarred as a youth by constant exposure to erotica and that exposure impacted his development; (4) Schiro suffered from a mental illness of longstanding duration and he and his family constantly sought treatment; (5) when able to stay away from alcohol and substance abuse, Schiro exhibited kind characteristics. Additionally, the jury heard evidence that Schiro was 20 years old at the time of the offense. These facts are well corroborated, however, they must be evaluated for review purposes in conjunction with the well corroborated evidence of Schiro's criminal history, including a robbery conviction, cruelty, and dangerousness.

When the unanimous rejection by the jury of the predicate for imposition of the death penalty, with all such rejection imports, is placed in tandem with the evidence in mitigation, with all such evidence imports, and so considered, we conclude that it may not be said that the facts available in the record support the conclusion that the death penalty is appropriate. *See Martinez Chavez* and *Roark, supra.*

### Conclusion

The judgment of the post-conviction court is reversed. The cause is remanded to the post-conviction court with instructions to set aside the death penalty and to impose in lieu thereof a term of sixty years, the maximum term of years authorized by the Legislature under these circumstances.

DICKSON, SULLIVAN and SELBY, JJ., concur.

SHEPARD, C.J., dissents with separate opinion.

SHEPARD, Chief Justice, dissenting.

Appellant Thomas N. Schiro has been permitted to litigate against the penalty of death imposed on him for killing Laura Luebbehusen for the last fifteen years. Every one of his legal claims has been rejected by every court. Several trial judges have ruled against him. This Court has done so three times. The federal District Court and Court of Appeals rejected his claims. The U.S. Supreme Court ruled against him by written opinion.

This determined litigation has finally paid off, as four judges of this Court have decided that Schiro should not die for his crime after all. Make no mistake; this decision is not "required by law."[1] Instead, my colleagues straightforwardly say they now believe that death is not "appropriate."

## I. History of the Case

The events leading to the death of twenty-eight year old Laura Luebbehusen (whose name is not mentioned in appellant's brief) on the night of February 4, 1981, began when Tom Schiro knocked on her door, told her that he had car trouble, and asked if he could use the phone.[2] Luebbehusen kindly permitted him to enter her home and to use her facilities. In a matter of hours, the unsuspecting Luebbehusen would be raped, murdered, and defiled.

Luebbehusen was unmarried and lived with a roommate. She had felt an aversion toward men ever since her rape as a child. Schiro knew this but nevertheless raped, bludgeoned, and strangled her, and concluded by indulging his necrophilic fantasies.

Age twenty at the time of the murder, Schiro had endured a troubled youth and became a criminal early in life.[3] Nonetheless, the people of Indiana generously provided him with opportunities to begin anew. Convicted of robbery, Schiro was permitted to participate in a work release program. At the time he killed Laura Luebbehusen, Schiro lived in the Second Chance Halfway House and received counseling and other assistance. Schiro also had a construction job and the support of a very tolerant girlfriend.[4]

Schiro worked across the street from Luebbehusen's home, and he observed her on several occasions. On the morning of February 4, Schiro glimpsed a woman, presumably Luebbehusen or her roommate, stepping onto the front porch to collect the mail. This sighting aroused Schiro and inspired him to begin what he called his "rape ritual." (R. at 1739–46.) It commenced with deliberate intoxication. While at work Schiro sniffed inhalants and consumed hard liquor, both of which he calculatingly concealed. (R. at 1742.) After work he stole a bottle of whiskey from a tavern and drank it alone. Schiro then read pornography and watched "quarter movies" at an adult bookstore.[5] Schiro masturbated as he watched the movies and twice exposed himself to the female attendant. (R. at 1743.) They threw him out.

Schiro proceeded to Luebbehusen's home. Under the ruse that he had car trouble, Schiro convinced Luebbehusen to admit him.

---

1. *See, e.g., Harris v. Alabama,* 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (Eighth Amendment does not require special standard of review when jury recommends against death).

2. Other facts of this case are recorded in our opinion in Schiro's direct appeal, *Schiro v. State,* 451 N.E.2d 1047 (Ind.1983) *(Schiro I),* and in the opinions of each of Federal Courts denying his *habeas corpus* petition. *Schiro v. Farley,* 510 U.S. 222, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994); *Schiro v. Clark,* 963 F.2d 962 (7th Cir.1992); *Schiro v. Clark,* 754 F.Supp. 646 (N.D.Ind.1990).

3. Though Schiro was only twenty years old, his criminal record displayed a pattern of antisocial conduct that had entangled him with the law since he was thirteen. (R. at 113.) In Schiro's two years as an adult before this murder, he was charged with criminal deviate conduct (case pending, Schiro released on bond on condition that he receive psychiatric treatment), indecent exposure (fine paid, case dropped pending Schiro undergoing mental test at State hospital), robbery (felony conviction with three year sentence suspended with Schiro to live in halfway house and participate in work release program), and public intoxication (case dropped pending Schiro's participation in Alcoholics Anonymous). *Id.*

4. Schiro's girlfriend testified at trial that he frequently abused her and her son.

5. "Quarter movies" are generally the most hardcore, sado-masochistic type of pornographic film. (R. at 1743.)

Schiro faked a telephone conversation and next asked Luebbehusen if he could use the bathroom, which she allowed. Schiro masturbated in the bathroom and then exposed himself to Luebbehusen. In an attempt to allay Luebbehusen's fear and shock, Schiro told her that he would not hurt her because he was gay and that he was in her home only because he was trying to win a bet with friends that he could "get it on" with a woman.

Luebbehusen revealed her lesbianism to him. She told of being sexually abused as a child and said that, except for the earlier rape, she was a virgin and had no desire for sex with a man. Schiro confined Luebbehusen in her own living room and forced her to ingest both alcohol and her roommate's prescription drugs as he pressed her to have sex. When she resisted, he raped her.

Luebbehusen made at least two attempts to escape. Once, she wrote a note to her roommate warning her not to enter and to call the police, but Schiro found it before Luebbehusen could leave it outside the door. She pleaded for mercy, promising not to tell anyone. Hours later, after Schiro had raped her multiple times, he passed out. She attempted to flee, but Schiro awoke and caught her before she made it through the door. He dragged her into her bedroom. When he believed she was asleep, he beat her over the head with a whiskey bottle and an electric iron. Luebbehusen fought back, so Schiro strangled her. Finally, he dragged Luebbehusen's body into the living room and committed necrophilia.[6]

Schiro took many steps to conceal his acts. From the outset, he wore gloves in order not to leave fingerprints. He straightened up the house before leaving. Schiro drove Luebbehusen's car to visit his girlfriend in Vincennes (she destroyed and disposed of the bloody gloves he wore that night). During his drive, Schiro disposed of a dildo he used in Luebbehusen's rape. Finally, upon his return to the halfway house at 5:30 a.m., Schiro cajoled the night attendant into falsifying his return time in the attendance log so that it appeared that he had returned at 12:15 a.m.

For several days, Schiro told no one what he had done. After five days he told his girlfriend, but both continued to conceal Schiro's involvement in Luebbehusen's rape and murder. Finally, when the police were investigating the halfway house two days later, Schiro told the house director that he had killed Luebbehusen. The director contacted the police, who arrested Schiro.

The trial was venued in Brown County because of the pre-trial publicity in Vanderburgh County. Schiro pled not guilty and asserted an insanity defense. The primary issue at trial thus concerned Schiro's state of mind, but he did not testify. Rather, evidence of Schiro's mental state came from five experts, all agreeing that Schiro was in touch with reality, understood the proceedings and the nature of the acts alleged, and was dangerous but not psychotic. Not one of the experts, including defense witnesses, testified that Schiro was insane. Schiro rocked back and forth in his seat whenever he was in the presence of the jury, but the guilty verdict demonstrated that the jury rejected both Schiro's insanity defense and the possibility he was guilty but mentally ill.

The Brown County jury deliberated one hour after the penalty phase of the trial and recommended against death.[7] The trial court subsequently sentenced Schiro to death after finding that he intentionally killed Luebbehusen, that no mitigating factors were proven, and that Schiro's rocking in court "may well have influenced the jury."

## II. The Jury Reasonableness Test

Schiro claims in this appeal that *Martinez Chavez* and *Roark* should be retroactively applied to his sentence. In *Martinez Chavez*, we described our review of such cases this way: A trial court can proceed to impose a penalty of death only . . . when all the facts available to the court point so clearly to the

---

6. Schiro performed anal and vaginal intercourse on Luebbehusen's lifeless body and bit the corpse in several places.

7. This jury was, of course, not the "conscience of the community" in which Laura Luebbehusen and Thomas Schiro lived at the time of the crime.

imposition of the death penalty that the jury's recommendation is unreasonable.

When we revised our approach in *Roark*, we concluded that the obligation *Martinez Chavez* had placed on trial court was "inconsistent with the independent sentencing authority which the trial court has under the death penalty statute." *Roark*, 644 N.E.2d at 570. We declared that a trial judge "satisfie[s] the requirement of due consideration of [a] jury recommendation" against death when it is apparent that the judge has reflected upon the jury recommendation at the point of final decision. *Id.* We further decided that we would apply the *Martinez Chavez* standard when on appeal we address the second of "two separate and distinct issues ... always presented for our consideration: (i) whether the trial court sentencing statement demonstrates due consideration of the jury recommendation; and (ii) whether this Court, upon independent reconsideration of a jury recommendation against death, nevertheless concludes that the death penalty is appropriate." *Id.* at 571.

Schiro argues that *Martinez Chavez* was not a new rule but an existing rule and says that it was erroneously not applied when he was sentenced. I conclude that this Court's review of his sentence has been consistent with the *Martinez Chavez/Roark* formulation. In reviewing Schiro's sentence on appeal, this Court said:

> "[W]e now turn to examine whether the sentence of death is appropriate. The transcript of the sentencing hearing and the trial court's written findings show that the court found that Schiro intentionally killed Laura Luebbehusen while committing or attempting to commit rape. After examining the record, we agree with the trial court's findings. Mary Lee and Dr. Frank Osanka recounted the events as told to them by Schiro. Schiro saw the victim a couple of times prior to the day of the murder. He made up his mind that he would rape her and perform his "ritual." After work, Schiro pretended that his car broke down and thus gained access to Luebbehusen's apartment by requesting assistance. Once inside ...

\* \* \*

As for the mitigating factors, the trial court did not find any. The court found that the defendant had been engaged in numerous instances of prior criminal conduct. Psychiatrists testified to Schiro's numerous rapes and other criminal deviate conduct. Mary Lee testified about Schiro's sadistic assaults on her child. Another witness testified that Schiro raped her in the presence of her child. Although the defendant related instances of sexual perversion, sadism, necrophilia, exhibitionism, and voyeurism, both of the court-appointed psychiatrists felt that Schiro was in good contact with reality. Both men testified that Schiro was not insane, showed no remorse, was violent and sadistic, and both thought him to be a danger to the community.

\* \* \*

We find that with the submission of the *nunc pro tunc* entry the trial court properly followed the required procedures in imposing the death sentence. The record justifies the finding of the aggravating circumstances that Thomas Schiro intentionally killed Laura Luebbehusen. Although the record shows that Schiro engaged in bizarre sexual perversions at an early age and for some length of time, we also find that the evidence, as attested to by psychiatrists, indicated he could have conformed his conduct to the law. Such pitiful behavior should not serve as an excuse for the atrocious acts in this matter. *The facts in the record, which show the horrifying nature of this rape/murder and the character of this offender, and the compliance of the trial court with the procedures of Ind.Code Sec. 35–50–2–9, lead us to conclude that the death penalty was not arbitrarily or capriciously applied, and is reasonable and appropriate.*"

451 N.E.2d at 1058–9 (emphasis added).

As it did when those words were written, the record is replete with facts demonstrating that the *Martinez Chavez* standard is met. For example, Schiro's expert, Dr. Osanka, testified that Schiro admitted that

he had committed at least eighteen, and probably "twenty-three or -four" other rapes,[8] and the jury rejected the verdict of guilty but mentally ill. Throughout his life, Schiro displayed contempt for both people and the law. He brazenly admitted in a presentencing interview that he manipulated the criminal justice system in order to avoid incarceration for his prior convictions. This fact corroborated the trial judge's suspicion of Schiro's rocking behavior in the presence of the jury and provided a plausible explanation for a jury recommendation that did not comport with the facts.

In *Schiro I* we quoted the U.S. Supreme Court's statement in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), regarding judicial sentencing in death penalty cases. Repeating it here emphasizes the correctness of the imposition and affirmance of Schiro's death sentence:

[I]t would appear that judicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced at sentencing than a jury, and therefore is better able to impose sentences similar to those imposed in analogous cases.

428 U.S. at 252, 96 S.Ct. at 2966. The trial court discharged this grave responsibility when it sentenced Schiro. This Court fulfilled its constitutional mandate and gave Schiro a thorough, individualized review of his sentence. The jury's recommendation has been given adequate weight and the post-conviction court was correct in denying Schiro relief on this ground.

### III. Conclusion

In Schiro's direct appeal, we found the death sentence to be reasonable in light of the offender and the crime. Schiro has litigated away more than half the sentence imposed by my colleagues today. He will now be released in something over fourteen years. I would instead affirm the sentence originally imposed.