Christopher D. PETERSON,
Defendant–Appellant,

v.

STATE of Indiana, Plaintiff–Appellee.

No. 45S00–9103–DP–223.

Supreme Court of Indiana.

Dec. 13, 1996.

James F. Stanton, Crown Point, for defendant–appellant.

Pamela. Carter, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for plaintiff–appellee.

DICKSON, Justice.

Defendant-appellant Christopher D. Peterson was convicted of two counts of murder for the intentional killing of two brothers, Ilija (Eli) Balovski (Count I) and George Balovski (Count II), in their tailor shop in Gary, Indiana. The State sought the death sentence on grounds that, in addition to committing the murders of Balovski brothers, the defendant had been convicted [on March 16, 1992] in Porter Superior Court of the December 1990 murders of Marie Meitzler and Harchand Singh Dhaliwal. After finding the defendant guilty, the jury heard evidence during the penalty phase of the trial and recommended that the death penalty not be

imposed. The trial court, finding that the aggravating circumstances overwhelmingly outweighed the mitigating circumstances, declined to follow the jury recommendation and imposed a sentence of death. We affirm.

On the afternoon of December 18, 1990, the Balovski brothers were each found dead inside the Eli Tailor Shop from shotgun wounds to the head. A sawed-off shotgun later recovered from the defendant's apartment was found to have fired a spent casing recovered at the crime scene. The defendant gave a statement to police admitting the shooting of the Balovski brothers, and he made incriminating admissions to an acquaintance.

The defendant presents numerous contentions grouped into three general issues: (1) whether a shotgun introduced into evidence was obtained by an unreasonable search and seizure and thus should have been suppressed; (2) whether the defendant's statements to police were properly admitted into evidence; and (3) whether the trial court erred in imposing the death penalty.

### 1. Search and Seizure

On the evening of January 28, 1991, a shooting occurred during an armed robbery of an individual at the Gainer Bank branch in Southlake Mall in Merrillville. A suspect, Antoine McGee, was questioned by police in connection with the mall bank shooting incident. McGee indicated he was not responsible for the shooting and implicated the defendant. Based on this information, the police proceeded to the defendant's mother's apartment to look for the defendant. The police received consent from the mother and searched the apartment attempting to find the defendant. While in the defendant's bedroom, the officers seized a sawed-off shotgun found in the closet.[1] The trial court determined the defendant had standing to challenge the search, but found the evidence was admissible because the defendant's mother had the right to consent to the search of her adult son's room, her consent was voluntary, and the shotgun was in plain view.

The defendant contends these rulings are in error and violate both the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution. In reviewing the trial court's ruling on the validity of a search, we consider the evidence favorable to the trial court's ruling and any uncontradicted substantial evidence to the contrary to determine whether there is sufficient evidence to support the ruling. *See Vance v. State*, 620 N.E.2d 687, 691 (Ind.1993).

### a. Federal Fourth Amendment

In addressing the defendant's claim of federal Fourth Amendment violations, we note that Fourth Amendment rights are personal and may not be vicariously asserted. *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387, 394 (1978). A defendant "aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by the search of a third person's premises has not had any of his Fourth Amendment rights infringed." *Id.* at 134, 99 S.Ct. at 425, 58 L.Ed.2d at 395. "[I]n order to challenge a search as unconstitutional, a defendant must have a legitimate expectation of privacy in that which is searched." *Livingston v. State*, 542 N.E.2d 192, 194 (Ind.1989) (citing *Rakas v. Illinois*). In reviewing whether a privacy expectation exists under a Fourth Amendment analysis, this Court also looks to whether the defendant has control over or ownership in the premises searched. *Lee v. State*, 545 N.E.2d 1085, 1091 (Ind.1989); *Livingston*, 542 N.E.2d at 194; *Stout v. State*, 479 N.E.2d 563, 566 (Ind.1985). The burden is on the defendant challenging the constitutional validity of a search to demonstrate that he had a legitimate expectation in the premises searched. *Livingston*, 542 N.E.2d at 194.

In ruling that the search was valid, the trial court stated:

I find that the defendant does have—or did have standing to object to any unlawful search and seizure of the apartment.

---

1. The officers also seized a duffel bag containing clothing worn during the crimes and shells from the shotgun. The trial court suppressed this evidence, finding that the items inside the bag were not in plain view and were therefore seized illegally.

However that issue is moot because I find that the defendant's mother gave her voluntary consent to the search of that apartment and that that consent is binding on the defendant.

Supplemental Record at 1093. The defendant stresses that he had been living in and had property in the searched room. Brief of Appellant at 56.

However, there exists substantial uncontradicted evidence contrary to the trial court's ruling. While the defendant *had* previously lived in the room which was searched, at the time of the search, the defendant had no control or ownership in the premises searched. On the day before the search, his mother had informed him that he could not live at the residence any longer, helped him pack his belongings, and took him to his girlfriend's house to stay with the understanding that he was to turn himself in for being AWOL from the Marines. Consequently, the defendant was no longer living at the apartment and thus had no expectation of privacy. *See Myers v. State,* 454 N.E.2d 861, 864 (Ind.1983) ("[O]nce defendant's rental period had expired, he no longer had an expectation of privacy."). Even had the defendant continued to exhibit some control over the bedroom closet where the shotgun was found, such control was completely defined by, subordinate to, and dependent upon the will of his mother and her right to control the entire premises. *Livingston,* 542 N.E.2d at 194; *see also Murrell v. State,* 421 N.E.2d 638 (Ind.1981). The apartment was leased to his mother and sister. His mother paid the rent. His mother had the sole determination as to whether or not he could reside at the apartment. His mother testified that she "often" searched the bedroom—including the closet where the evidence was located—looking for drugs the defendant may have hidden. His mother also allowed other persons to reside in the apartment and, significantly, the *defendant's* sister sometimes shared the bedroom at night, further diminishing any expectation of privacy he may have had. *See Humes v. State,* 426 N.E.2d 379, 381 (Ind. 1981). In addition, the defendant is hard-pressed to claim a privacy expectation in light of the fact that no fewer than six separate individuals had keys to the apartment[2] and the defendant's friend, Antoine McGee, exercised access and control over the defendant's bedroom when the defendant was not at the apartment. There is no reasonable expectation of privacy under these circumstances.

Notwithstanding our deferential review of trial court rulings, the evidence does not support the conclusion that the defendant had standing to challenge the search of his mother's apartment. Moreover, the cursory treatment of the standing issue by the trial court and its characterization of standing as being "moot" implies that the trial court chose to deny the defendant's motion on the merits of the consent issue rather than on standing. Because we find that, as a matter of law, the defendant lacked standing to challenge the search, we reject his claim that the admission of the shotgun violated his Fourth Amendment rights.

### b. Indiana Constitution

■■■ The defendant also claims the search violated his rights as guaranteed by Article I, Section 11 of the Indiana Constitution. Separate and apart from the federal Fourth Amendment analysis, Article I, Section 11 of the Indiana Constitution provides an independent prohibition against unreasonable searches and seizures. *Moran v. State,* 644 N.E.2d 536, 540 (Ind.1994). Such challenges are analyzed under an independent "reasonableness" standard. *Id.* This case requires that we determine whether and to what extent there exists a prerequisite of standing to challenge violations of Article I, Section 11.

■■■ Prior Indiana cases based upon Section 11 rather than federal Fourth Amendment jurisprudence establish that the "right 'to be secure in their persons, houses, papers and effects, against unreasonable search and seizure' [under Section 11] is a personal right of the individual whose person,

---

**2.** The defendant, his mother, his sister, two of his friends—Antoine McGee and "Ian"—and the mother's boyfriend, Major Moore.

house, papers or effects are searched or seized." *Snedegar v. State,* 196 Ind. 254, 257, 146 N.E. 849, 849–50 (1925). Indiana law has also imposed a requirement of standing to challenge a search or seizure—a defendant cannot successfully object to a search of the premises of another if such search does not unlawfully invade his own privacy. *Tongut v. State,* 197 Ind. 539, 544, 151 N.E. 427, 429 (1926). If the facts fail to establish that the alleged illegal search and seizure actually concerned the person, house, papers or effects of the defendant, he will not have standing to challenge the illegality. *Earle v. State,* 194 Ind. 165, 168, 142 N.E. 405, 406 (1924).

We note that the federal inquiry into standing under the Fourth Amendment focuses, in most part, on the defendant's privacy expectation in the premises searched. While cases interpreting our state constitutional provision have also placed significant focus on the premises searched, independent consideration is directed to the defendant's interest in the property seized.[3] This Court, in *Snedegar,* found that the defendant did not have standing under Article I, Section 11 to challenge a search because:

> [N]either in the oral nor the written motion, nor in the evidence offered in support of the motion, was there any statement or intimation that the defendant Snedegar owned or had an interest in the house or rooms where the search was made or lived or roomed there, or owned anything that was found or seized there.

*Snedegar,* 196 Ind. at 256, 146 N.E. at 850. Similarly, this Court in *Speybroeck v. State,* 198 Ind. 683, 154 N.E. 1 (1926), found the defendant's "right in regard to search and

seizure, given by the state Constitution, is a personal one." *Id.* at 686, 154 N.E. at 2. As such, the court found that the "defendant cannot avail himself of an objection to the legality of the search of a place with which he has no connection, or of the seizure of property in which he had no interest." *Id.* Therefore, to challenge evidence as the result of an unreasonable search or seizure under Article I, Section 11, a defendant must establish ownership, control, possession, or interest in either the premises searched or the property seized.[4]

As noted in our prior discussion, the defendant does not have standing to challenge the entry into his former bedroom and closet. He has shown no ownership, control, possession or interest in the premises searched. Consequently, we do not reach the merits of his claims that his mother did not have authority to consent to the search of the bedroom closet and that her consent was not voluntary.

As to the seizure of the shotgun found in the closet, we must look to whether the defendant has established any ownership, control, possession or interest in it. In his confession, the defendant explicitly disclaimed ownership in the shotgun. However, this is not the end of our inquiry. "It is not necessary to decide whether or not the appellant in fact owned the [property seized] .... The right of possession is of sufficient interest in the subject matter of a search to entitle appellant to the protection of the constitution." *Dalton v. State,* 230 Ind. 626, 631, 105 N.E.2d 509, 511 (1952). In his confession, the defendant admits he had the right

---

3. This is in contrast to the federal standing inquiry. In *Rawlings v. Kentucky,* 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), the United States Supreme Court held that a person does not have standing as to seized property in which he has an interest unless, in addition, he has a legitimate expectation of privacy in the premises where the property was found. *See also U.S. v. Salvucci,* 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).

4. *See also Tyler v. State,* 202 Ind. 559, 562, 177 N.E. 197, 198 (1931) (Where the defendant did not assert that he "had or claimed either ownership or possession of such places searched, or of property seized[,]" he could not "avail himself of

an objection to the legality of the search of premises or property...."); *Piercefield v. State,* 198 Ind. 440, 442, 154 N.E. 4, 4–5 (1926) ("A person not being the owner or proprietor of the premises searched and not claiming any interest in the property so found cannot complain, upon the trial, of an alleged illegal search, nor object to the introduction of evidence thus obtained."); *Hines v. State,* 197 Ind. 575, 581, 150 N.E. 371, 373 (1926) ("A person not being the owner or proprietor of the premises searched ... and not claiming any interest in the property so found, cannot complain upon the trial, of an alleged illegal search nor object to the introduction of evidence thus obtained.").

to possess the shotgun as collateral until a debt was repaid. Under Section 11 of the Indiana Constitution, the defendant therefore has standing to challenge the seizure of the shotgun, and we will address the defendant's claim of insufficient evidence to support the trial court's finding that the shotgun was properly seized as contraband in plain view.

Cases applying Article I, Section 11 of the Indiana Constitution do not precisely employ the "plain view doctrine" of federal Fourth Amendment jurisprudence. The police in *Lindsey v. State*, 246 Ind. 431, 204 N.E.2d 357 (1965), discovered stolen contraband "in plain view" and the defendant challenged the discovery as an illegal search. *Id.* at 439, 204 N.E.2d at 362. Noting that, "Indiana decisions have not dealt extensively with the question of what constitutes a search," the *Lindsey* court determined that, "[i]n the law of searches and seizures, the term 'search' implies prying into hidden places for that which is concealed." *Id.* (citation omitted). The court then determined there was no prying and the contraband taken was not hidden: "There was simply a discovery of that which was open to view.[5]" *Id.* Thus under Section 11, police observation of an item in open view is not a search.

The trial court admitted the shotgun after finding that the weapon was openly visible, that the officer had probable cause to believe that it was sawed-off, and that it was contraband.[6] The location of the shotgun when first observed by police is an issue upon which the evidence is conflicting. Officer Borchert testified that the shotgun was in the duffel bag. However, Corporal Zenone testified that the shotgun was not in the duffel bag but was leaning against the wall in the closet in plain view. Where the evidence is conflicting, this Court will consider only that evidence which tends to support the trial court's ruling and will uphold the trial court if the ruling is supported by substantial evidence of probative value. *Coleman v. State*,

490 N.E.2d 711, 713 (Ind.1986). Corporal Zenone's testimony that the weapon was visible satisfies our standard. Corporal Zenone did not have to pry into hidden places, and the weapon was not concealed. He simply made a discovery of that which was open to view. The trial court did not err in ruling that the shotgun was admissible.

### 2. Admissibility of Defendant's Statements

The defendant contends that his confession should not have been admitted into evidence because it was the product of both an illegal arrest and an unreasonable delay in taking him before a magistrate. The defendant confessed to four shotgun murders, including the charged murders, approximately twenty-nine hours after his warrantless arrest by police.

The defendant's arrest resulted from the police investigation of a late night armed robbery and shooting at the Gainer Bank branch at Southlake Mall in Lake County approximately six weeks after the murders of the Balovski brothers. The robbery victim identified his assailant as a black male wearing dark clothing and told police his assailant drove a silver Nissan Sentra automobile stolen from the victim. Soon thereafter the police saw a vehicle matching this description and, observing the license plate number, confirmed that it was the stolen automobile. The police also observed a copper Grand Am automobile with two occupants, both black males, traveling with the Nissan Sentra and notified dispatch as to this fact. The driver of the Nissan Sentra stopped the car in the middle of the road, exited the vehicle, and fled on foot. The driver, wearing a black jogging suit with purple markings, matched the victim's description of his assailant. Shortly thereafter, another police officer observed two black males on foot in the vicinity, Antoine McGee and Major Moore, one of whom (McGee) fit the description of the as-

---

5. We note that federal Fourth Amendment cases utilize the terms "plain view" and "open view" to denote different types of circumstances. *See* 16 WILLIAM A. KERR, INDIANA PRACTICE, Criminal Procedure Section 2.2(e) (1991).

6. Under the Indiana Code, it is illegal to possess a sawed-off shotgun. IND.CODE Section 35–47–5–4.1(6) (1993). The defendant concedes the sawed-off shotgun was contraband and that law enforcement officers have authority to seize contraband during a valid warrantless search when the contraband is in plain view.

sailant who had just fled from police. The two men were transported to the police station for questioning as suspects in the robbery and shooting. McGee identified himself as the driver of the copper Grand Am and told police that the defendant had announced his plan to commit the robbery and asked McGee to help. McGee admitted that he drove the defendant to the Southlake Mall, waited there briefly and observed the defendant, wearing a black jogging suit and carrying a handgun, get out of the car and approach the bank. McGee then drove away but looked back and saw a silver Nissan automobile arrive at the bank. Later in the evening he saw the defendant driving the same silver Nissan. Based on this information, the police arrested the defendant without a warrant.

The trial court found that the defendant's arrest was illegal because the police lacked probable cause to make the arrest. However, the trial court determined that the defendant's subsequent statements were admissible because the passage of time was sufficient to render the statements voluntary rather than the impermissible product of an illegal arrest. The State argues that the trial court erroneously concluded that McGee's statements did not supply probable cause for the warrantless arrest.

■ On appeal from a trial court's determination regarding the admissibility of the defendant's statements, we will not weigh the evidence nor resolve credibility. *Snellgrove v. State*, 569 N.E.2d 337, 343 (Ind.1991). The trial court's finding will be upheld if there is substantial evidence of probative value to support it. *Id.*[7]

■ A warrantless arrest of the defendant is permissible when, at the time of the arrest, the arresting officer has probable cause to believe the defendant committed a felony. *Bergfeld v. State*, 531 N.E.2d 486, 489 (Ind.1988). "Probable cause exists when, at the time of the arrest, the arresting officer has knowledge of facts and circumstances which would warrant a man of reasonable caution to believe that the defendant committed the criminal act in question." *Id.* at 490. The amount of evidence needed to meet the probable cause requirement is determined on a case-by-case basis. *DiTommaso v. State*, 566 N.E.2d 538, 540 (Ind.1991). The arresting officer may base his belief that probable cause exists to arrest a person upon information received from another, although, generally, the reliability of an informant should be established before a finding of probable cause can be made. *Pawloski v. State*, 269 Ind. 350, 353, 380 N.E.2d 1230, 1232 (1978). Reliability is usually shown by (1) an informer's past record of reliability or (2) by extrinsic facts proving an informer's information reliable. *Id.*

■ The informant here, McGee, made statements to police which, while linking the defendant to the shooting, also demonstrated McGee's knowledge of facts indicating his reliability. McGee's description of the defendant's clothing matched that worn by the robber at the bank branch; the weapon seen by McGee in the possession of the defendant was consistent with that used by the robber; and the silver Nissan automobile McGee saw the defendant drive was the same color and type of automobile as that which had been stolen at the time of the robbery. In addition, while McGee denied any involvement in the shooting, he admitted to driving the defendant to the Mall, with knowledge of the defendant's criminal objective. This admission led to his being charged with one count of Robbery, a Class A felony.[8] The trial court, noting that McGee denied

---

7. We note that the United State Supreme Court has recently held:

> [A]s a general matter determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal. Having said this, we hasten to point out that a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.

*Ornelas v. U.S.,* — U.S. —, —, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911, 920 (1996).

8. McGee subsequently entered into a plea agreement with the State in which he pled guilty to Assisting a Criminal, a Class C felony and agreed to testify against the defendant in exchange for the State's agreement to drop the Robbery charge.

involvement in the shooting, concluded that his statements to police were not sufficiently against his self-interest to provide an adequate indicia of reliability as the basis for probable cause. We hold that this determination was legal error.

This Court, in *Suggs v. State*, 428 N.E.2d 226 (Ind.1981), provided the framework under which we analyze this issue:

> For the purpose of establishing probable cause to arrest without a warrant, the reliability of the information provided by an informant whose statements may be self-serving must be established by reference to facts and circumstances which indicate the information is trustworthy. The collective knowledge of the police included the facts that [the informant] was a participant in events leading up to a point shortly before the shooting, and that in making his statement he exposed himself to charges for serious crimes.

*Id.* at 227–28 (included citations omitted). The *Suggs* court then found that

> [p]eople do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search.

*Id.* at 228 (citing *United States v. Harris*, 403 U.S. 573, 583, 91 S.Ct. 2075, 2082, 29 L.Ed.2d 723, 734 (1971)). The court concluded, "[the informant's] admissions against penal interest and the fact that he was a direct participant in events leading to the shooting were sufficient to establish his trustworthiness for the purpose of probable cause to arrest." *Id.*

We find that McGee's statements admitting direct participation in events leading to the shooting, admissions which led to felony charges being filed, were sufficient to establish his trustworthiness for the purpose of probable cause to arrest. The fact that his statements also served to corroborate information previously obtained by the police provide further indicia of reliability. We find that the trial court's conclusion regarding the absence of probable cause for the defendant's arrest is not supported by substantial evidence of probative value. The arrest, although warrantless, was lawful.

The defendant further disputes the admissibility of his statements to police, including his confessions to the murders, on grounds that there was an unreasonable delay in bringing him before the magistrate after his warrantless arrest. He contends that his statements resulted from violations of the Fourth Amendment to the United States Constitution; Article I, Sections 11 and 12 of the Indiana Constitution; and Indiana Code Sections 36–8–3–11, 35–33–7–1, 2, and 5. At trial, when the State moved to admit this evidence, the defendant objected "based upon previous arguments raised in the [d]efendant's [m]otion to [s]uppress these confessions on the basis of the illegal arrest and obtaining the statements through duress or coercion." Record at 2916. Although denied by the trial court, the defendant's motion to suppress, together with its supporting memorandum, asserted that the interval between his arrest and presentation before a judicial officer constituted an unreasonable delay and a violation of Indiana Code § 35–33–7–1, and that he was thereby denied Fourth Amendment rights guaranteed by the United States Constitution. However, because his trial objection and incorporated motion and supporting memorandum did not assert any violation of the Indiana Constitution he has waived the claim that a delay in his presentment violated the Indiana Constitution.

The defendant was arrested at approximately 4:15 a.m. on Monday, January 29. The initial questioning of the defendant by a police detective commenced at approximately 6:50 a.m. after the defendant indicated a desire to speak with a police detective. The defendant was read and furnished a written copy of his *Miranda* rights advisement. The defendant indicated that he wished to waive his Fifth Amendment rights, signed a waiver form, and issued a statement. Initial questioning was completed at approximately 8:00 a.m. and the defendant was then taken to a jail cell. A second interview between police and the defendant occurred later that day at approximately 2:30 p.m. after the defendant again signed a written waiver of these rights. The second interview was interrupted at the

request of the defendant so that he could speak privately with his mother. Following the conversation, the police interview with the defendant ceased because the defendant told police he wanted "to sleep on it." Additional statements were taken from the defendant the next day, Tuesday, January 30, beginning at approximately 8:55 a.m. After again being advised of his rights, the defendant signed another waiver of rights form. At this time, the defendant was advised that if he felt uncomfortable at any time or no longer wished to be interviewed, the interview would be terminated. At 9:21 a.m., the defendant—stating to police detectives, "You've been straight with me, I'll be straight with you"—confessed to the shotgun murders. Supp. Record at 2911. The defendant's tape recorded statements were reduced to typewritten form, reviewed by the defendant, and verified as accurate by the defendant's signature. Breaks were taken between each statement when the defendant was provided refreshment and allowed to use the bathroom. Sometime before noon, the defendant was returned to jail. The defendant's first appearance before the magistrate was at approximately 4:00 p.m. on Tuesday, January 30, approximately thirty-six hours after his arrest.

■ "For a confession or statement to be admissible it must be determined that the accused made the statement voluntarily and that the free will of the accused was not overcome through inducement, violence, threats, or other improper influences." *Warner v. State*, 579 N.E.2d 1307, 1309 (Ind. 1991). In determining the voluntariness of any custodial statement we will examine the totality of the facts surrounding its making. *Brown v. State*, 577 N.E.2d 221, 229 (Ind. 1991), *cert. denied*, 506 U.S. 833, 113 S.Ct. 101, 121 L.Ed.2d 61 (1992). On appeal, this Court will review a voluntariness question as we do other sufficiency matters, and will not reweigh the evidence. *Massey v. State*, 473 N.E.2d 146, 147 (Ind.1985).

The United States Supreme Court has held that persons arrested without an arrest warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause. *Gerstein v. Pugh*,

420 U.S. 103, 114, 95 S.Ct. 854, 863, 43 L.Ed.2d 54, 65 (1975). However, individual states are allowed to integrate prompt probable cause determinations into their differing systems of pretrial procedures. *County of Riverside v. McLaughlin*, 500 U.S. 44, 52, 111 S.Ct. 1661, 1668, 114 L.Ed.2d 49, 60 (1991). The *Riverside* Court declared that, as a general matter, a jurisdiction which provides judicial determination of probable cause within forty-eight hours of arrest will be immune from systemic challenges unless the arrested individual can prove that his or her probable cause determination was delayed unreasonably. *Riverside*, 500 U.S. at 56, 111 S.Ct. at 1670, 114 L.Ed.2d at 63. Additionally, a judicial evaluation of whether delay in a particular case is unreasonable must allow a substantial degree of flexibility. *Id.*

■ The State has "a heavy responsibility" to bring an arrestee before a neutral, detached magistrate without undue delay. *Pawloski v. State*, 269 Ind. 350, 358, 380 N.E.2d 1230, 1234 (1978). Indiana Code Section 35–33–7–1 provides, in relevant part, that a person arrested without a warrant for a crime shall be taken promptly before a judicial officer. Indiana Code Section 35–33–7–2 provides, in part, that at or before the initial hearing, the facts upon which a warrantless arrest was made shall be submitted to a judicial officer for a probable cause determination. Additionally, Indiana Code Section 36–8–3–11 provides, in part, that an arrested person, except when a Sunday intervenes, may not be detained longer than twenty-four hours before being brought before the court having jurisdiction of the offense, to be dealt with according to the law.

■ It is uncontested that more than twenty-four hours elapsed between the time of the defendant's arrest and his presentation to a magistrate for a probable cause determination. We can find nothing in the record which would serve as a legitimate explanation for the State's failure to comply with the twenty-four hour time requirement. However, while the defendant urges that the remedy for violation of the twenty-four hour limit is "suppression of any statements made by the defendant," this suppression is only re-

quired if the statement is "found by the trial court to have resulted from the inherently coercive effect[ ] of prolonged detention." *Minnick v. State*, 544 N.E.2d 471, 477 (Ind. 1989). A confession made during a period of illegal detention is not inadmissible *solely* because of the delay in presenting the arrestee to a magistrate. Such delay is only one factor to consider in determining the statement's admissibility. *Pawloski*, 269 Ind. at 358, 380 N.E.2d at 1234. It is only when the confession is the product of that detention that it must be suppressed. When the confession is the product of the defendant's free will, it is admissible. *Id.* at 358, 380 N.E.2d at 1235.

■■ The trial court found that "in view of the totality of all the evidence and all of the information and everything before the court, that again the statements were a product of the free will of the defendant and not a product of . . . the detention beyond whatever period of time you feel he ought to have been taken before the Magistrate. . . ." Supp. Record at 1404. We agree. The record demonstrates the defendant's statements were the product of his own free will. He was fully informed of his pertinent constitutional rights on four separate instances, and he explicitly waived those rights each time. He visited with his mother during the period of incarceration prior to his confession and the record shows he was not promised anything in exchange for his statement, nor was he threatened in any way in order to coerce him into providing a statement. We find that the defendant's improperly prolonged detention—standing alone—does not invalidate the trial court's finding of voluntariness. The record supports a finding that the confession was given voluntarily and not the result of a coercive environment. Taking the circumstances as a whole, the causal connection between the delayed detention and the confession was not sufficient to necessitate the exclusion of the defendant's confession. We therefore hold the trial court properly denied the defendant's motion to suppress his confession.

### 3. Death Penalty

In support of his contention that the trial judge improperly failed to follow the jury's recommendation against imposition of the death penalty, the defendant presents three principal arguments: 1) that the Indiana system is unconstitutional because it depends upon a judicial subjective determination of reasonableness; 2) that the death sentence in this case is improper because mitigating factors were proven and the judge failed to articulate a sufficient reason for imposing the death penalty; 3) that the Indiana system of jury recommendation and judicial sentencing decision violates the Indiana Constitution.

In *Roark v. State*, 644 N.E.2d 565 (Ind. 1994), this Court summarized the applicable Indiana statutory scheme, Indiana Code Section 35–50–2–9, as follows:

> Our death penalty statute provides three distinct steps which the trial court must take in reaching its sentencing decision in cases in which the jury has found the defendant guilty of Murder and the State seeks the death penalty. First, the trial court must find that the State has proved beyond a reasonable doubt that at least one of the aggravating circumstances listed in the death penalty statute exists. Second, the trial court must find that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. This evaluation and weighing process should be described in the trial court's sentencing statement. Third, before making the final determination of the sentence, the trial court must consider the jury's recommendation.

> However, the death penalty statute also provides that the trial court is not bound by the jury's recommendation.

*Id.* at 570 (included citations omitted).

■■ Charged with the responsibility to exercise appellate jurisdiction in "appeals from a judgment imposing a sentence of death" and to "review and revise the sentence imposed," Art. VII, Section 4, Indiana Constitution, this Court in recent years has endeavored to improve the system of review in order to assure full and adequate consideration of jury recommendations against death. In *Martinez Chavez v. State*, 534 N.E.2d 731 (Ind.1989), we sought to "develop a standard

appropriate to the separate roles of judge and jury," *Id.* at 734, and concluded that:

> In order to sentence a defendant to death after the jury has recommended against death, the facts justifying a death sentence should be so clear and convincing that virtually no reasonable person could disagree that death was appropriate in light of the offender and his crime. A trial court cannot override the jury's recommendation unless the facts meet this standard.

*Id.* at 735. Upon rehearing, we further advised that a trial judge can proceed to impose a penalty of death only "when all the facts available to the court point so clearly to the imposition of the death penalty that the jury's recommendation is unreasonable." *Martinez Chavez v. State*, 539 N.E.2d 4, 5 (Ind.1989).

We revisited this *Martinez Chavez* standard, however, in *Roark v. State*, and held that the obligation imposed by this standard upon the trial court "is inconsistent with the independent sentencing authority which the trial court has under the death penalty statute." *Roark*, 644 N.E.2d at 570. It was our conclusion that "to require the trial court to test a jury's recommendation against death by the *Martinez Chavez* standard interferes with the trial court's statutory freedom from being bound by the jury's recommendation." *Id.* However, while lifting from the trial court the responsibility for a strict *Martinez Chavez* review and deference to a jury recommendation against death, we accepted the responsibility to assure full and adequate consideration of jury recommendations as part of our appellate review responsibilities:

> During appellate review of a death sentence where the jury has recommended against death, two separate and distinct issues are always presented for our consideration: (i) whether the trial court sentencing statement demonstrates due consideration of the jury recommendation; and (ii) *whether this Court, upon independent reconsideration of a jury recommendation against death, nevertheless concludes that the death penalty is appropriate.*

*Id.* at 571 (emphasis added). Unfortunately, this articulation of the appellate standard was impinged by a subsequent passage in *Roark* reciting the *Martinez Chavez* language and appearing to compel this Court's acquiescence to a jury non-death recommendation unless facts in the record so clearly point to the death penalty "that the jury's recommendation is unreasonable." *Id.* Applying this language literally would elevate the recommendation of an advisory jury above the judgment of the trial court, thereby interfering with the judge's statutory freedom from being bound by the jury's recommendation, contrary to the principles of *Roark. Id.* at 570.

In cases decided since *Roark*, we have discussed or applied its principal holding establishing the jury recommendation review standard as "whether this Court upon independent reconsideration of a jury recommendation against death, nevertheless concludes that the death penalty is appropriate," without the application of the *Martinez Chavez* requirement of mandatory deference to the jury recommendation absent a finding of its unreasonableness. *Schiro v. State*, 669 N.E.2d 1357, 1358 (Ind.1996). *See also Holmes v. State*, 671 N.E.2d 841, 854 (Ind. 1996) ("When the jury recommends that death not be imposed, and the judge nevertheless imposes death, the sentence will not stand unless the sentence is appropriate."). What these cases imply we today expressly hold, thereby resolving any inherent inconsistency in *Roark*. As part of our death penalty review we will independently consider the jury recommendation against death and determine whether the death penalty is appropriate. However, we will *not* employ a standard that requires the facts in the record to so clearly point to the imposition of the death penalty that the jury's recommendation is unreasonable.

In the present case, because the trial court judgment occurred before our decision in *Roark*, the trial judge reflects his review of the jury recommendation using the *Martinez Chavez* methodology. The defendant contends that the *Martinez Chavez* standard is unconstitutional because it depends upon a subjective determination of the

reasonableness of the jury recommendation. However, the Eighth Amendment does not require a state to define the weight to be accorded to an advisory jury verdict. *Harris v. Alabama*, 513 U.S. 504, ——, 115 S.Ct. 1031, 1036, 130 L.Ed.2d 1004, 1014 (1995). The important factor is whether the capital sentencing scheme adequately channels the sentencer's discretion so as to prevent arbitrary results, which is satisfied by requiring the jury and judge to weigh aggravating and mitigating circumstances. *Id.* at ——, 115 S.Ct. at 1035, 130 L.Ed.2d at 1013–14. This comports with Indiana procedures. Furthermore, because we have since replaced the *Martinez Chavez* trial court standard with an appellate one based upon the appropriateness of the penalty for the offender and the offense, the defendant's argument is not applicable.

■ The defendant next contends that the death sentence in this case is improper because mitigating factors were proven and the judge failed to articulate a sufficient reason for imposing the death penalty. He asserts that the imposition of the death penalty notwithstanding the contrary jury recommendation was arbitrary and discriminatory. The defendant contrasts the mitigating factors found in this case with those noted in various other decisions of this Court reversing death sentences where there had been a jury recommendation against death, and he urges that the these other killings "were far more horrible than in this case." Brief of Appellant at 37.

The United States Supreme Court has recognized that "[t]here is no reason to expect that the advisory verdicts will be treated uniformly in every case." *Harris*, 513 U.S. at ——, 115 S.Ct. at 1037, 130 L.Ed.2d at 1016. "The disparate treatment of jury verdicts simply reflects the fact that, in the subjective weighing process, the emphasis given to each decisional criterion must of necessity vary in order to account for the particular circumstances of each case." *Id.* The Constitution is not offended when a state "requires the sentencing judge to consider a jury's recommendation and trusts the judge to give it the proper weight." *Id.*

The defendant next contends that Indiana's capital sentencing procedure, which permits the death penalty to be imposed notwithstanding a contrary jury recommendation, violates provisions of our state constitution regarding the right to trial by jury, the proper purposes of the penal code, and the requirement for proportional penalties.

■ In Article One of our Indiana Constitution, Section 13 assures the right of a jury trial to persons accused in criminal proceedings, and Section 19 provides that such juries "shall have the right to determine the law and the facts." The defendant urges that these provisions require that the factfinding associated with determining the existence and weight of the statutory aggravating and mitigating circumstances be the exclusive province of a jury, not the sentencing judge. This is not so. This Court has long held that a defendant's right to trial by jury is not offended by a statutory scheme under which the trial judge, not a jury, determines the facts for sentencing. *Williams v. State*, 271 Ind. 656, 395 N.E.2d 239 (Ind.1979); *Skelton v. State*, 149 Ind. 641, 49 N.E. 901 (1898). The right to trial by jury under the Indiana Constitution is limited to the question of guilt or innocence. *Miller v. State*, 149 Ind. 607, 619, 49 N.E. 894, 898 (1898). The legislature may therefore create an advisory jury mechanism to assist the court in determining sentencing matters without violating Indiana's constitutional protection for rights to jury trial and to jury determination of facts and law.

■ We also reject the defendant's contention that Indiana's death penalty advisory jury system violates Article I, Section 18 of the Indiana Constitution: "The penal code shall be founded on the principles of reformation, and not of vindictive justice." He asserts that, in contrast to jury recommendations, the determinations of trial judges are more likely to be vengeful and unforgiving, and this violates our constitution's antipathy for vindictive justice. We disagree. This Court has consistently held that capital punishment and Indiana's statutory death penalty procedures do not violate the admonitions of Section 18. *See Harrison v. State*, 644 N.E.2d 1243 (Ind.1995) *cert. denied* —— U.S.

——, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). Likewise, an advisory jury scheme does not offend this provision.

■ The defendant also argues that the statutory capital advisory jury procedure violates Article I, Section 16 of the Indiana Constitution which requires that all penalties "shall be proportioned to the nature of the offense." His argument that juries are better able to determine proportionality than are judges presents no constitutional issue. Even if jury determinations were superior to those by judges as to proportionality, a questionable proposition at best, it does not follow that our state legislature has violated Section 16 by choosing to place the sentencing responsibility with the judge. This Court has emphasized that "Indiana's death sentence procedure must be cautiously restrained to assure maximum compliance with the proportionality concerns" of Section 16. *Bivins v. State*, 642 N.E.2d 928, 955 (Ind.1994), *cert. denied*, —— U.S. ——, 116 S.Ct. 783, 133 L.Ed.2d 734 (1996). In part because of the proportionality requirement in Section 16, we engage in a special appellate scrutiny of death sentences. *Harrison*, 644 N.E.2d at 1260. Our constitutional duties include an independent review of mitigating and aggravating circumstances and an examination of whether the death sentence is appropriate. *Cooper v. State*, 540 N.E.2d 1216, 1218 (Ind. 1989). Indiana's death penalty procedure, including its utilization of an advisory jury, fully complies with Section 16.

Just as we have rejected the defendant's contentions that various individual provisions of the Indiana Constitution are separately violated by the statute prescribing an advisory jury in death penalty sentencing proceedings, so too we decline to accept his contention that, taken as a whole, our state constitution mandates exclusively a jury determination of life and death. The system of jury recommendation and judge decision does not violate the Indiana Constitution.

Having found no error in the trial court sentencing determination, it is now our duty under the Constitution and statutes of Indiana to determine whether in our judgment the death penalty is appropriate for the defendant under the circumstances of this case. IND. CONST. art. VII, § 4; IND.CODE § 35–50–2–9(j) (Supp.1996); *Lowery v. State*, 547 N.E.2d 1046, 1059 (Ind.1989), *cert. denied*, 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990). As part of this review, we will reconsider the jury recommendation against the death penalty. *Roark*, 644 N.E.2d at 571.

■ Evidence presented during the penalty phase of the trial described the defendant as neglected in his childhood by his father, and yet as caring and supportive for others, including his girlfriend and their baby. He had been a good and quiet prisoner during his confinement in jail. At the subsequent sentencing hearing, the court considered the presentence report and arguments of counsel.

The trial court set forth extensive reasons for imposing the death penalty. It found that the State proved beyond a reasonable doubt the existence of three aggravating circumstances: 1) the defendant committed the two charged murders on December 18, 1990; 2) on March 16, 1992, the defendant was convicted of the murder of another victim; and 3) on March 16, 1992, the defendant was convicted of the murder of yet another victim. The trial court found the following as mitigating circumstances: the defendant has no history of other prior criminal conduct, he was under extreme mental or emotional disturbance when he committed the murder, he was the product of a broken home without a consistent father figure during his adolescent years, he graduated from high school, he served two years in the U.S. Marine Corps, he is the father of a child then eleven months old at the time of sentencing, and he was only twenty-one years old at the time of the murders. Upon "weighing, evaluating and balancing the aggravating circumstances and the mitigating circumstances," the trial court found the aggravating circumstances "to overwhelmingly outweigh the mitigating circumstances." Record at 430. In its sentencing statement, the trial court gave extensive consideration to the jury's recommendation against death, but ultimately declined to follow it and imposed a death sentence. We find that the sentencing statement demon-

strates due consideration of the jury recommendation.

Upon our independent review, we find evidence of the defendant's difficult childhood, his emotional disturbance, his having consumed some alcohol at the time of the offense, his graduation from high school, his service in the Marines, his age, and his caring relationship with his child and her mother. The mitigating weight warranted for each of these considerations is in the low range, individually and cumulatively. We find that these mitigating circumstances are outweighed by the aggravating circumstances: the murders of Ilija Balovski and George Balovski and the defendant's convictions for the murders of Marie Meitzler and Harchand Singh Dhaliwal. These aggravating circumstances are of the highest range. We specifically note that the jury recommended that the death penalty not be imposed. This is particularly significant because this is the same jury that unanimously found the defendant guilty of two murders and were prepared to accept their role in rejecting the State's request for the death penalty. The jury's recommendation reflects a statement by the "conscience of the community." *See Roark,* 644 N.E.2d at 570. Having given due consideration to the jury's recommendation, we nevertheless determine that the proper and appropriate sentence for the defendant, Christopher D. Peterson, is the death penalty. This sentence is also proportionate not only to the nature of the offense but also to the sentences approved for capital murder defendants in other Indiana cases.

*Conclusion*

We affirm the defendant's murder convictions and find that the death penalty statute, Indiana Code Section 35–50–2–9, was fully complied with and accordingly affirm the conviction.

SHEPARD, C.J., and SELBY and BOEHM, JJ., concur.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Justice, concurring.

Today's appellant is the eighth individual whose death sentence we have reviewed under circumstances where the trial court imposed the sentence notwithstanding a unanimous jury recommendation against death.[1] Reflecting perhaps the difference in opinion between judge and jury at the trial level in these cases, this court has almost always found itself divided on whether the death sentence was appropriate.[2] Several times we have attempted to articulate a standard for jury overrides but never without drawing dissents.[3] While I myself find the approach articulated by Chief Justice Shepard in *Martinez Chavez,* 539 N.E.2d at 5, to be closest to my view of how these situations should be handled, I join today's opinion both because I do not find it varies too much from the *Martinez Chavez* standard and because of the advantageousness of our court finally reaching consensus in this important area.

1.  *See Schiro v. State,* 669 N.E.2d 1357 (Ind.1996) (overruling *Schiro v. State,* 451 N.E.2d 1047 (Ind. 1983)); *Roark v. State,* 644 N.E.2d 565 (Ind. 1994); *Kennedy v. State,* 620 N.E.2d 17 (Ind. 1993); *Jackson v. State,* 597 N.E.2d 950 (Ind. 1992); *Minnick v. State,* 544 N.E.2d 471 (Ind. 1989); *Martinez Chavez v. State,* 534 N.E.2d 731 (Ind.1989), *reh'g denied,* 539 N.E.2d 4; *Thompson v. State,* 492 N.E.2d 264 (Ind.1986).

2.  *See Schiro,* 669 N.E.2d 1357 (rev'g sentence by 4–1 vote) (overruling 451 N.E.2d 1047 (aff'g sentence by 3–2 vote)); *Roark,* 644 N.E.2d 565 (rev'g sentence by 3–2 vote); *Kennedy,* 620 N.E.2d 17 (rev'g sentence by 3–2 vote); *Jackson,* 597 N.E.2d 950 (rev'g sentence by 3–2 vote); *Minnick,* 544 N.E.2d 471 (aff'g sentence by 3–2 vote; DeBruler, J., dissenting, in which Dickson, J., concurred, on grounds other than jury override); *Martinez Chavez,* 534 N.E.2d 731 (rev'g sentence by 4–1 vote); *Thompson,* 492 N.E.2d 264 (rev'g sentence by 3–2 vote on grounds other than jury override).

3.  *Compare Roark,* 644 N.E.2d at 569 *with* 644 N.E.2d at 573 (Givan, J., dissenting); *Martinez Chavez,* 539 N.E.2d at 5 and 534 N.E.2d at 733 *with* 534 N.E.2d at 740 (Pivarnik, J., dissenting); *Schiro,* 451 N.E.2d at 1053 *with* 451 N.E.2d at 1070 (Prentice, J., dissenting).