## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Megan Shipley
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Brian Reitz
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Roy Huddleston,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

October 26, 2015

Court of Appeals Case No.
49A04-1502-CR-65

Appeal from the Marion Superior Court

The Honorable Ronnie Huerta, Judge

Trial Court Cause No.
49F19-1403-CM-12049

**Robb, Judge.**

# Case Summary and Issues

[1] Following a bench trial, Roy Huddleston was convicted of carrying a handgun without a license as a Class A misdemeanor. Huddleston appeals his conviction, raising two restated issues for our review: 1) whether the trial court abused its discretion by admitting evidence obtained during a warrantless search; and 2) whether the trial court violated Huddleston's privilege against self-incrimination by improperly considering his failure to testify at trial. Concluding the trial court did not abuse its discretion and did not violate Huddleston's privilege against self-incrimination, we affirm.

# Facts and Procedural History

[2] On March 8, 2014, Officer William Wogan of the Indianapolis Metropolitan Police Department was patrolling in the 1500 block of North Rural Street when he observed four individuals standing around a parked silver Pontiac. The car was parked less than fifteen feet from a fire hydrant.[1] Officer Wogan recognized one of the individuals and decided to circle the block. When Officer Wogan returned, the same four individuals were getting into the parked car. Rodrey Milo, whom Officer Wogan knew, was sitting in the driver's seat.

---

[1] Pursuant to Indiana Code section 9-21-16-5(4), a person may not stop, stand, or park a vehicle within fifteen feet of a fire hydrant. A violation of this section is a Class C infraction. Ind. Code § 9-21-16-9.

[3] Officer Wogan requested assistance because he knew from previous encounters that Milo did not have a valid driver's license. Officer John Walters responded and ran a Bureau of Motor Vehicles ("BMV") check to confirm Milo did not have a valid driver's license. While waiting for Officer Walters to arrive, Officer Wogan observed Milo start the car, but the car did not move. When Officer Walters arrived, he activated his emergency lights and parked directly behind the Pontiac.

[4] As Officer Walters pulled in, the occupants of the car became "animated and start[ed] moving about." Transcript at 18. They seemed to be reaching in the area around the center console. Using a two-way radio, Officer Walters advised Officer Wogan of the movement in the car. Both officers exited their squad cars and approached the Pontiac—Officer Walters on the driver's side and Officer Wogan on the passenger side. Officer Walters requested identification from all of the occupants. Milo was still in the driver's seat; Huddleston was in the front passenger seat; Stephanie Pettigrew was in the rear passenger-side seat; and Jaquez Perkins was in the rear seat on the driver's side. Officer Wogan remained by the car while Officer Walters returned to his squad car to confirm identities, conduct BMV checks, and check for outstanding warrants. There were no outstanding warrants, but none of the occupants had a valid driver's license.

[5] When Officer Walters returned, he ordered the occupants out of the vehicle, "due to their movements" and the fact that no one had a valid driver's license.

*Id.* at 44. Officer Walters suspected the occupants had been concealing a weapon:

> [State:] Officer Walters, why was it that you deemed it necessary to ask the subjects to exit the car?
>
> [Officer Walters:] According to my training and experience, I know that the center console and underneath the seats are often times—areas that weapons can be concealed and other contraband can be concealed. So when I see people that are reaching towards those areas, obviously that alerts my senses to the possibility of those items being found there.
>
> [State:] Okay. Was it for safety reasons that you did proceed the way that you did?
>
> [Officer Walters:] Yes. * * * I told them to get out of the car because I'm not going to leave people in the car that could have a weapon at their access. * * * I can tell you, by the movements that I saw, they were consistent with somebody manipulating items either in the center console or reaching into the floorboard to the rear. . . . I'm saying that those movements in and of themselves are indicative of people that may be concealing weapons or contraband.

*Id.* at 27, 31, 33.

[6] The officers conducted patdown searches but found nothing. Officer Wogan proceeded to search the vehicle. He discovered a black leather holster in the center console and a handgun inside a purse. The purse was on the floorboard behind the front passenger seat, "[c]loser to the middle of the vehicle." *Id.* at 68. The handgun was a black and silver, .45 caliber semi-automatic; it was

wrapped in a black stocking cap and placed "directly on top" of the purse's contents. *Id.*

[7] During the course of the stop, Officer Christopher Shaw arrived on scene to assist. Officer Shaw advised Huddleston of his *Miranda* rights, and Huddleston stated he understood those rights. Officer Walters then asked Huddleston "if there would be anything in the car concerning." *Id.* at 94. Huddleston responded, "There's a pistol." *Id.* When asked to describe it, Huddleston said it was a black and silver "forty-five" that "shouldn't have a round in its chamber." *Id.* at 94-95. Officer Walters told Huddleston the handgun was found in Pettigrew's purse and asked Huddleston if the handgun belonged to her. Huddleston said, "No, it's mine." *Id.* at 94.

[8] Based on Huddleston's admission, the officers arrested only Huddleston. The State charged Huddleston with carrying a handgun without a license as a Class A misdemeanor. A bench trial was held on January 22, 2015, during which Huddleston objected to the admission of evidence seized from the car. Defense counsel argued the search was unreasonable under the Fourth Amendment and Article 1, Section 11 of the Indiana Constitution. The trial court took the admission of the handgun under advisement.

[9] In addition, Huddleston called Tianna Yates-Mason to testify. Yates-Mason testified the car belonged Pettigrew but the handgun belonged to her. Yates-Mason claimed she had placed the handgun in Pettigrew's purse. She described the gun as a black and silver "forty caliber." *Id.* at 112. When asked how many

bullets the gun could hold, Yates-Mason answered, "I think the clip held twelve, maybe. I'm not really—I'm not a hundred percent sure." *Id.* at 121. Huddleston did not testify. During closing argument, defense counsel argued Huddleston's earlier admission was "just a stupid moment of chivalry" to "take . . . the heat off of someone else." *Id.* at 129.

[10] After hearing the evidence and closing argument, the trial court admitted the handgun and found Huddleston guilty as charged. The trial court sentenced Huddleston to twenty-four hours of community service and 365 days in jail, with eight days of credit for time served and the remainder suspended to probation. Huddleston now appeals.

# Discussion and Decision

## I. Admission of Evidence

### A. Standard of Review

[11] Huddleston contends the trial court erred in denying his motion to suppress. But when a defendant challenges the constitutionality of a search following a completed trial, the issue is more appropriately framed as whether the trial court abused its discretion by admitting evidence. *Cartwright v. State*, 26 N.E.3d 663, 667 (Ind. Ct. App. 2015), *trans. denied*. "The trial court abuses its discretion only if its decision is clearly against the logic and effect of the facts and circumstances before it, or if the court has misinterpreted the law." *Fuqua v. State*, 984 N.E.2d 709, 713 (Ind. Ct. App. 2013), *trans. denied*. In reviewing

the trial court's decision, we do not reweigh the evidence and consider conflicting evidence most favorably to the ruling. *Meredith v. State*, 906 N.E.2d 867, 869 (Ind. 2009). We defer to the trial court's factual determinations unless clearly erroneous, but review the constitutionality of the search de novo. *Id.*

## B. Fourth Amendment

[12] Huddleston concedes the initial traffic stop was proper but argues the warrantless search of the Pontiac violated the Fourth Amendment[2] because the police lacked "reasonable suspicion Huddleston was armed and dangerous." Brief of Appellant at 19.[3] The Fourth Amendment guarantees "[t]he right of the

---

[2] Huddleston also claims the police impermissibly extended the duration of the traffic stop. *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."). To the extent Huddleston refers to the time required to conduct BMV checks and check for outstanding warrants, the U.S. Supreme Court has stated,

> Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly.

*Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015) (citations, alterations, and internal quotation marks omitted); *accord State v. Quirk*, 842 N.E.2d 334, 340 (Ind. 2006) ("Where an officer stops a vehicle for a traffic violation, a request for the driver's license and vehicle registration, a license plate check, a request to search the driver's vehicle and an inquiry regarding whether the driver has a weapon in the vehicle are within the scope of reasonable detention [under Article 1, Section 11].").

In the present case, after completing the routine checks associated with a traffic stop, the police ordered the occupants out of the vehicle to conduct patdown searches and search the passenger compartment of the vehicle. The traffic stop was prolonged by the search of the occupants and the vehicle, and the handgun was discovered in the vehicle. Accordingly, Huddleston essentially challenges the propriety of the search of the vehicle.

[3] The passenger compartment of a vehicle may be searched without a warrant when the police have a reasonable belief that a suspect poses a danger:

> [T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on "specific and articulable facts which, taken together with the rational inferences from

people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. "But the extent to which the Fourth Amendment protects people may depend upon where those people are." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). In order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he or she has a legitimate expectation of privacy in the place searched. *Id.*

[13] In *Rakas v. Illinois*, 439 U.S. 128 (1978), the petitioners challenged the admission of evidence seized from a vehicle in which they were passengers. The United States Supreme Court concluded it was unnecessary to decide whether the search of the vehicle violated the Fourth Amendment, as the petitioners had failed to show "they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers." *Id.* at 148. The Supreme Court affirmed the trial court's decision to admit the evidence because "Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Id.* at 133-34 (quoting *Alderman v. United States*, 394 U.S. 165, 174 (1969)). "Like the trunk of an automobile," the Court reasoned, "these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy." *Id.* at 148-49.

those facts, reasonably warrant" the officers in believing that the suspect is dangerous and the suspect may gain immediate control of weapons.

*Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)).

[14] Likewise, Huddleston was merely a passenger in the vehicle. The handgun was discovered in a purse that did not belong to him, inside a car that he neither owned nor used. Yet, Huddleston contends his romantic relationship with Pettigrew "suggests a possessory interest in the car and the purse, since couples expect to share the use of cars, regardless of whose name is on the title, and couples often store personal items in each other's purses and bags." Br. of Appellant at 20. He relies on *Pollard v. State*, 270 Ind. 599, 388 N.E.2d 496 (1979), a case in which our supreme court held that a husband had a legitimate expectation of privacy in a vehicle titled to his wife.

[15] As to the vehicle, the present case is distinguishable because Huddleston and Pettigrew are not married, and nothing in the record suggests Huddleston ever used Pettigrew's car. Furthermore, the *Pollard* decision seems to turn on a statement from *Rakas* disclaiming "arcane distinctions developed in property and tort law" in defining the scope of Fourth Amendment interests. *Id.* at 606, 388 N.E.2d at 503 (quoting *Rakas*, 439 U.S. at 143). "Thus the legitimacy of a defendant's privacy expectations in the searched premises will not always turn upon whether his name appears on the deed, lease or certificate of registration," our supreme court explained. *Id.* Although the car was titled to Pollard's wife, Pollard also used the car and therefore had a reasonable expectation of privacy in the car. By contrast, we have no basis on which to conclude Huddleston had any sort of possessory interest in the Pontiac.

[16] As to the purse, our supreme court has more recently stated, "a woman's purse . . . is uniquely related to a given individual and is not ordinarily accessible by a

man." *Lee v. State*, 849 N.E.2d 602, 608 (Ind. 2006), *cert. denied*, 549 U.S. 1211 (2007); *see also Krise v. State*, 746 N.E.2d 957, 970 (Ind. 2001) ("[P]ersons have a legitimate expectation of privacy in *their* purses and other closed containers that normally hold highly personal items.") (emphasis added). It may be true couples occasionally store personal items in each other's bags, but absent evidence that Huddleston and Pettigrew actually did this, we have no basis on which to conclude Huddleston had any expectation of privacy in Pettigrew's purse. *See Rawlings v. Kentucky*, 448 U.S. 98, 105 (1980) (holding the defendant who dumped drugs into a friend's purse did not have a legitimate expectation of privacy in the purse because he "never sought or received access to her purse prior to that sudden bailment").

[17] Huddleston also argues he has standing to object to the search of the car because there was no evidence he "*did not* have permission to use the car." Br. of Appellant at 20 (emphasis in original). He cites *Campos v. State*, 885 N.E.2d 590 (Ind. 2008), in support of this argument. In *Campos*, our supreme court addressed the ability of a passenger in a *borrowed* car to challenge the constitutionality of a search, holding Campos had standing to challenge the search of the car because "the State . . . produced no evidence . . . that Campos did not have permission to use it." *Id.* In *Campos*, the car was borrowed, and its owner was absent. Here, the owner was present in the car at the time of the stop. The exception announced in *Campos* simply does not apply. *See Campos*, 885 N.E.2d at 598 ("[A] driver who is not the owner has no standing if the owner is also in the car.").

[18] As Huddleston has failed to show he had a legitimate expectation of privacy in the places searched, we conclude the search did not violate Huddleston's Fourth Amendment rights.

## C. Article 1, Section 11

[19] Huddleston also claims the search violated his rights under Article 1, Section 11 of the Indiana Constitution, which provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ." Although Section 11 and the Fourth Amendment are "textually identical, they are analytically distinct." *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). "The Fourth Amendment analysis turns on whether the subject has a 'reasonable expectation of privacy,' while the Section 11 analysis turns on whether the police conduct was reasonable under the totality of the circumstances." *Id.* at 1001-02 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring)).

[20] In addition, standing to challenge a search under Section 11 differs in some respects from standing to assert a Fourth Amendment claim. *Campos*, 885 N.E.2d at 598. The Indiana Constitution "provides protection for claimed possessions irrespective of the defendant's interest in the place where the possession was found." *Id.* Stated differently, to challenge a search under Section 11, "a defendant must establish ownership, control, possession, or interest in either the premises searched *or the property seized*." *Peterson v. State*,

674 N.E.2d 528, 534 (Ind. 1996) (emphasis added), *cert. denied*, 522 U.S. 1078 (1998).

[21]     Huddleston argues he has standing to challenge the search under Section 11 because he "told Officer Walters that the handgun was his" and thus has "an ownership interest in the handgun." Br. of Appellant at 9. The State disagrees, arguing Huddleston has no standing under Section 11 because he "did everything he could to disclaim ownership and control of the firearm at trial." Brief of Appellee at 24. "If a defendant who disclaims ownership in property found in a purse that does not belong to him in a car that does not belong to him has standing, it is difficult to envision scenarios where a defendant would not have standing," the State maintains. *Id.* We are inclined to agree with the State but narrowly conclude the search was reasonable, regardless of the standing issue.[4]

[22]     We evaluate the reasonableness of a search under Section 11 by balancing: "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs."

---

[4] A defendant's "disclaimer of ownership" is a "strong indication that a defendant does not expect the article to be free from government intrusion." *State v. Machlah*, 505 N.E.2d 873, 877 (Ind. Ct. App. 1987) (quoting *United States v. Hawkins*, 681 F.2d 1343, 1346 (11th Cir.), *cert. denied*, 459 U.S. 994 (1982)), *trans. denied.* Where a defendant's disavowal is entirely "inconsistent with a claim of privacy interest . . . he cannot later successfully assert that claim." *Id.*; *see also Tyler v. State*, 202 Ind. 559, 177 N.E. 197, 198 (1931) ("A defendant cannot avail himself of an objection to the legality of the search of premises or property which he does not own, control, or have an interest in, or of premises or property in which he disclaims ownership, control, or interest") (citation omitted), *cited with approval in Peterson*, 674 N.E.2d at 534 n.4.

*Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005). In assessing reasonableness, "we recognize that Indiana citizens are concerned not only with personal privacy, but also with safety, security, and protection from crime." *Saffold v. State*, 938 N.E.2d 837, 840 (Ind. Ct. App. 2010), *trans. denied.* "[T]herefore, reasonableness under the totality of circumstances may include consideration of police officer safety." *Id.*

[23] In the present case, Officer Walters testified he ordered the occupants out of the vehicle "due to their movements" and the fact that no one had a valid driver's license. Tr. at 44. Officer Wogan searched the vehicle because Officer Walters suspected the occupants had been concealing a weapon. Officer Walters recounted his observations at trial:

> [Officer Walters:] As I pulled behind the car and . . . initiated the traffic stop, with the emergency equipment, I noticed the individuals inside the vehicle to become animated [sic] and start moving about.
>
> [State:] How many individuals did you see from your position?
>
> [Officer Walters:] I could see all four of the occupants' heads and shoulders in the vehicle.
>
> [State:] And how far away would you say you were?
>
> [Officer Walters:] Less—probably less than a car length behind the vehicle.
>
> [State:] Okay. So go ahead, you observed people moving about?
>
> [Officer Walters:] Correct. And obviously my attention was

draw [sic] to these movements because they can be an officer safety awareness issue, so I witnessed Roy Huddleston start moving about in the manner—he actually turned his body towards the center console. Dipped his left shoulder towards the center console. . . . He looked towards the rear of the car, towards the rear seat passengers. I also saw the rear seat passenger, Miss Pettigrew, who was seated directly behind Roy Huddleston, bend over to where her head and her shoulders disappeared from my view briefly. As if she might be reaching for something on the floorboard or something in front of her. . . . These movements were in sync with one another. They precipitated . . . one another. I also saw the—the driver, Mr. Milo, also turn towards the center console dippin' his shoulders as if he was possibly reaching as well towards the center console or—or to the rear of the back seat.

*Id.* at 18-20.

[24] Under the totality of the circumstances, we narrowly conclude the protective search of the Pontiac was reasonable. First, regarding the degree of suspicion, Officer Walters had reason to believe the occupants were concealing an object in the center console area. He observed three of the occupants moving "in sync with one another," toward the same area of the car. *Id.* at 20. In his experience, these coordinated movements were "indicative of people that may be concealing weapons or contraband." *Id.* at 33; *see Patterson v. State*, 958 N.E.2d 478, 486 (Ind. Ct. App. 2011) ("In determining whether an officer acted reasonably under the circumstances, we consider the specific, reasonable inferences that the officer is entitled to draw from the facts in light of his or her experience."). Second, as to Huddleston specifically, the degree of intrusion was slight at best. Huddleston was merely a passenger in the car, and the

handgun was discovered in a purse that did not belong to him. Finally, we note traffic stops are "especially fraught with danger to police officers." *Patterson*, 958 N.E.2d at 487 (quoting *Long*, 463 U.S. at 1047). As Officer Walters testified, furtive movements can be an officer safety issue.

[25] In this instance, in light of the special dangers facing police officers conducting traffic stops, the search was reasonable under the totality of circumstances and did not violate Huddleston's rights under Section 11. The trial court did not abuse its discretion by admitting the handgun.

## II.   Privilege Against Self-Incrimination

### A. Standard of Review

[26] Lastly, Huddleston argues the trial court violated his privilege against self-incrimination by improperly considering his failure to testify at trial. The Fifth Amendment prevents a person from being "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Comment on a defendant's refusal to testify at trial is barred by the Fifth Amendment, as it penalizes the exercise of a constitutional privilege. *Griffin v. California*, 380 U.S. 609, 614 (1965). However, statements concerning the uncontradicted nature of the State's evidence do not violate a defendant's Fifth Amendment privilege. *Dumas v. State*, 803 N.E.2d 1113, 1118 (Ind. 2004). Comment on the lack of defense evidence is permissible so long as the statement focuses on the absence of any evidence to contradict the State's evidence and not on the accused's failure to testify. *Id.* Moreover, "[w]e presume the trial judge is aware of and

knows the law, and considers only evidence properly before the judge in reaching a decision." *Id.* at 1121.

## B. Huddleston's Silence

[27] Huddleston was found guilty at the conclusion of a bench trial. He claims the trial court improperly considered his failure to testify in reaching this verdict and takes issue with the trial court's explanation of its verdict. During closing argument, defense counsel argued Huddleston's earlier admission was "just a stupid moment of chivalry" to "take the heat off of someone else." Tr. at 129. The State countered,

> It was not chivalry. . . . [I]t was a refreshing moment of honesty by a defendant who had a gun without a permit. He owned up to it immediately. We have heard nothing today . . . that refutes his position that day . . . his admission that it was in his possession.

*Id.* at 130-31. Defense counsel objected, asserting Huddleston's privilege against self-incrimination. The trial court assured defense counsel Huddleston's silence would not be considered and allowed the State to conclude.

[28] After hearing the evidence and closing argument, the trial court found Huddleston guilty of carrying a handgun without a license:

> [T]his is a constructive possession case obviously. . . . He didn't possess it, he didn't have it exactly at that moment . . . . But the problem becomes and the State said, he knew the condition of the gun. He knew the color of the gun. He knew the description

of the gun. He knew that the gun was not loaded.[5] Then you have another witness, Defense's only witness that comes in and I just found her totally . . . not credible at all. Problem is, what caliber is it. It's a forty cal. She was certain that it was a forty cal. Mr. Huddleston knew it was a forty-five caliber. And the gun was a forty-five caliber. She's talking about a double stack magazine, which that gun is not capable of taking. She's talking about twelve rounds. It's a single stack magazine. It only takes six. She wasn't even close. I just didn't find her credible. . . . And he made, you know, admissions to the officers that were counter to his interest. And that's a tough one to overcome as well. *Had the testimony been different, had she been accurate with the gun and then he stated that explanation why he did what he did. That may . . . have muddied the waters enough.* But for me, I just didn't find her credible. She was just so inaccurate with the gun. And—I didn't believe her. So based on that I am going to find the State has met their burden and find Mr. Huddleston guilty of Possession of a Firearm.

*Id.* at 133-34 (emphasis added).

[29] Citing *Mitchell v. United States*, 526 U.S. 314, 330 (1999), Huddleston claims the trial court is stating that it held his silence against him, thereby imposing an impermissible burden on the exercise of a constitutional privilege. Br. of Appellant at 26. But in *Mitchell*, the comments at issue plainly focused on the defendant's failure to testify. The district court judge told Mitchell at sentencing, "I held it against you that you didn't come forward today . . . . I'm taking the position that you should come forward and explain your side of the

---

[5] The gun was technically loaded, but as Huddleston stated, it did not have a round in the chamber.

issue." *Id.* at 319 (holding the district court's comments imposed an impermissible burden on the privilege against self-incrimination). Here, the trial court judge explicitly stated he would not be considering Huddleston's silence. Tr. at 131 ("No, I'm not going to hold it against him for sure.").

[30] We believe the trial court judge was referring to the uncontradicted nature of the State's evidence. The bulk of the judge's remarks concerned the credibility of the defense witness who directly contradicted Huddleston's prior admission. The judge, as fact-finder, did not consider her testimony credible. Accordingly, the statement concerned "the absence of any evidence to contradict the State's evidence," not Huddleston's failure to testify. *Dumas*, 803 N.E.2d at 1118.

# Conclusion

[31] The trial court did not abuse its discretion by admitting evidence and did not violate Huddleston's privilege against self-incrimination. We therefore affirm Huddleston's conviction for carrying a handgun without a license.

[32] Affirmed.

Vaidik, C.J., and Pyle, J., concur.